Howard AMIDON, Appellant,

v.

STATE of Alaska, Appellee.

Carol Sue MENARD, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 2511, 2512.

Supreme Court of Alaska.

June 2, 1977.

Edgar Paul Boyko, Edgar Paul Boyko & Associates, and Michelle V. Minor, Anchorage, for appellants.

Patrick J. Gullefsen, Asst. Dist. Atty., and Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

RABINOWITZ, Justice.

After trial by jury appellant Carol Sue Menard was found guilty of the crime of embezzlement by bailee[1] and appellant Howard Amidon was found guilty of aiding and abetting Menard in violation of the same statutory provision.[2] The superior court thereafter sentenced appellants each to serve a term of three years imprisonment.

In this appeal Amidon and Menard have raised numerous specifications of error ranging from challenges to the sufficiency of the evidence before the grand jury through a challenge asserting the excessiveness of the sentences which the superior court imposed. The relevant factual background is as follows:

Suza Ellen Wagner, a 62-year-old woman, owned and operated Sue's Polaris Cafe in Fairbanks. During the course of her employment, Grace Vetter, an employee of the restaurant, was injured. After the injury, Mrs. Wagner learned that she had failed to

---

1. AS 11.20.290(a) provides:

 A bailee, with or without hire, who embezzles, or wrongfully converts to his own use, or who secretes, with intent to convert to his own use, or who fails, neglects, or refuses to deliver, keep, or account for, according to the nature of his trust, money or property of another delivered or entrusted to his care or control which may be the subject of larceny is guilty of embezzlement and is punishable as provided in § 280 of this chapter.

2. AS 12.15.010 abolishes the distinctions between accessories and principals:

 The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, shall be prosecuted, tried, and punished as principals.

obtain workmen's compensation insurance, and sought advice of her lawyer. Her attorney allegedly counseled her to liquidate and remove her assets from banks in Fairbanks and deposit them elsewhere. Mrs. Wagner then withdrew money from her bank account, but instead of redepositing it, she secreted some $26,500 cash in her home.

Appellant Carol Sue Menard is Mrs. Wagner's granddaughter. She lived in Anchorage with her friend, Howard Amidon. In August of 1973 Menard's mother, Mrs. Wagner's daughter, became ill and was hospitalized. Menard drove to Fairbanks to see her mother but upon arrival learned she had been moved to Anchorage.

Menard returned to Anchorage accompanied by her grandmother, Mrs. Wagner, and the secreted cash.[3] Wagner stayed with Menard and Amidon at their apartment in Anchorage. Testimony is conflicting as to who first brought up the subject of a safe deposit box for the money, but the end result of the discussion between these parties was that the money was counted, denominations noted, and the following day some $26,500 was placed in a box in Menard's name to which Menard had the key.[4] Mrs. Wagner testified that she was under the impression that anytime she needed any of the money a bank draft would be sent to her.

Subsequently, a triplex apartment owned by Mrs. Wagner in Fairbanks was destroyed in a fire and, as a result, she received insurance proceeds of $63,781.55. Mrs. Wagner did not cash the draft from the insurance company at the time of receipt, but later, when in Anchorage, deposited it in Menard and Amidon's account. The understanding was that when the draft cleared, the proceeds would be placed in the safety deposit box.

In November of 1973 Amidon and Menard decided to move to Fairbanks. Prior to leaving Anchorage, they withdrew $63,781.55 from their joint account in the form of a cashier's check payable to Menard. They also took the cash from the safety deposit box.

In late November the cashier's check and $15,950 in cash were deposited in the Mt. McKinley Mutual Savings Bank in Fairbanks. Shortly thereafter an additional $13,075 was deposited, of which $10,000 was Mrs. Wagner's. Wagner claimed she was told her money had been transferred to a safety deposit box in Fairbanks at that time. At about this same time, Wagner directed that $10,000 be used to make a loan to her friends, Quentin (Dale) and Goldie Setzer. Repayments were to be made to an account in Menard's name with Wagner as beneficiary. Wagner permitted Amidon and Menard to have the interest on the loan, as well as an amount of interest sufficient to pay income taxes attributable to the interest.

Because she suffered from headaches, dizziness and other symptoms, Wagner made plans to visit a Seattle clinic in April 1974. Three to five days prior to her intended departure date, Mrs. Wagner requested $3,000 of Menard. She did not receive the requested money prior to leaving for Seattle on April 16, 1974. She asserted Menard told her on the day of departure that Amidon was bringing the money home that evening, but Wagner declined to delay her departure.[5] Four days earlier, Menard and Amidon had withdrawn $80,778.35 in the form of a cashier's check from Mt. McKinley Mutual Savings Bank and had cashed the check at Alaska National Bank.[6]

---

**3.** The testimony conflicts as to who first broached the subject of carrying the cash, as well as a coin collection, to Anchorage. Although Wagner indicated she would have taken the money with her anyway (as was her habit when leaving for a time), she testified that Menard first suggested not leaving the money.

**4.** Wagner testified that Menard offered her the box key but she declined to take it since this would prevent Menard from having access to the money in the event Wagner called from Fairbanks after her return home to ask Menard to send her cash.

**5.** Wagner received $4,000 from Menard after arriving in Seattle.

**6.** Menard testified she withdrew this money pursuant to direction from Wagner who was

Wagner returned from Seattle around June 25 and found Menard and Amidon to be cold and distant toward her. In the early afternoon of July 9, Mrs. Wagner, in the company of the Setzers, went to Menard's house to request the return of the money. Prior to their arrival at Menard's house, Goldie Setzer had placed a cassette recorder in her purse for the purpose of recording any conversations they would have with Menard. At that time Wagner's money was in a briefcase in a bedroom closet not far from the room in which the conversation took place. When Mrs. Wagner asked Menard for the money, Menard asserted she had to do laundry and could not get it right away. Mrs. Wagner was under the definite impression that the money was still downtown in a bank account. Menard appeared to indicate by words and acts that Amidon would be her spokesman. The conversation ended with an understanding that Mrs. Wagner would return at 6:30 p. m. when Amidon was expected home.

When Mrs. Wagner and Goldie Setzer returned that evening, Amidon denied knowledge of what money she was talking about, stated they had given her money back before she went outside, further stated they did not have any of her money, and dared Mrs. Wagner to call the police. Wagner turned the matter over to the police on or about July 10, and indictments charging

Menard with embezzlement by bailee and Amidon with aiding and abetting were returned on October 22, 1974. A search warrant executed on October 24 uncovered a briefcase in appellants' bedroom closet containing some $59,000 in cash and an I.O.U. note for $16,000 from one Chris Katsekures.

We now turn to appellants' numerous specifications of error, the bulk of which do not require extended discussion. Appellants assert that the indictments failed to charge an offense. The indictment which was returned against Menard reads as follows:

That on or about the 9th day of July, 1974, at or near Fairbanks in the Fourth Judicial District, State of Alaska, Carol Sue Menard, a bailee without hire, did knowingly, wilfully, unlawfully and feloniously refuse to deliver and account for money, to-wit: more than Sixty-three Thousand ($63,000) Dollars: said money belonging to Suza E. Wagner, and which had been entrusted on or about October 19, 1973, to the care of said Carol Sue Menard, by Suza E. Wagner on the condition that the total amount or any fraction thereof demanded would be returned to Suza E. Wagner on demand.[7]

Appellants argue that this indictment fails to charge with sufficient specificity the requisite intent for the crime, namely, the specific intent to permanently deprive Wagner

concerned that the presence of some $80,000 in a savings account would constitute a record of money attachable in the *Vetter* suit for injury. She stated the money was placed in a closet at her home. This apparent conflict in the testimony (Wagner asserting she was told on April 16th that Amidon would bring the money home that evening, Menard testifying the money was already in her home) represents the sort of contradiction that prompted Judge Carlson to assert that he thought Menard was lying on the stand.

7. The separate indictment which was returned against Howard Amidon reads, in part, as follows:

That on or about the 9th day of July, 1974, at or near Fairbanks, in the Fourth Judicial District, State of Alaska, Howard Amidon did knowingly, wilfully, unlawfully, and feloni-

ously aid and abet Carol Sue Menard in the embezzlement of money, to-wit: more than Sixty-three Thousand ($63,000.00) Dollars, said money belonging to Suza E. Wagner, which had been entrusted on or about the 19th day of October, 1973, to the care of Carol Sue Menard, a bailee without hire, and which money said Carol Sue Menard and said Howard Amidon refused to deliver to Suza E. Wagner, which money had been entrusted to Carol Sue Menard on the condition that the total amount or any fraction thereof would be returned to Suza E. Wagner on demand.

All of which is contrary to and in violation of Alaska Statute 11.20.290 and Alaska Statute 12.15.010 and against the peace and dignity of the State of Alaska.

of the money in question.[8] However, the very case appellants cite as authority on this point, *Thomas v. State*, 522 P.2d 528 (Alaska 1974), states that

[A]n indictment should be read in the light of common sense and should not be vulnerable to attack for technical defects. The fundamental purposes of the indictment are to furnish the accused with a description of the charge against him to enable him to prepare his defense and to permit him to claim double jeopardy in the future should he again be charged with the same offense.

The requirement that every element of the offense should be alleged must be read in the light of this 'fairness' approach.[9]

In *Thomas* we concluded that we would follow the weight of authority and held that an indictment charging a person with "unlawfully and feloniously" doing an act constitutes sufficient allegation of intent to support an indictment for sale of a narcotic. 522 P.2d at 531. In our view, the question is whether the accused was sufficiently alerted to the elements of the offense to defend against the charge. That question was answered by our holding in *Thomas* that the general allegation of felonious and unlawful met the test.

■ In addition contending that the indictment here is defective because of the failure to allege that Menard had the intent to permanently deprive Wagner of the money she had entrusted to Menard, appellants further argue that the indictment failed to specify a demand by Wagner for the monies in question. When read against the *Thomas* criteria and the provisions of Criminal Rule 7(c),[10] we conclude that the indictments in the case at bar are legally sufficient to charge the crimes of embezzlement by bailee and aiding and abetting in the commission of the crime of embezzlement by bailee.[11] For here there is no showing of prejudice by either appellant. Further, the offense charged, namely, embezzlement by bailee, is sufficiently alleged for double jeopardy purposes. The indictment explicitly charges each of the statutory elements of the offense of embezzlement by bailee, and further alleges that the refusal to deliver or account was done "knowingly, wilfully, unlawfully and feloniously." In our view, this latter language encompasses the specific intent to permanently deprive an owner of his or her property.

■ Appellants claim that they were improperly charged with embezzlement by bailee under AS 11.20.290(a), and should instead have been charged with embezzlement by trustee under AS 11.20.330.[12] We have concluded that appellants were correctly charged with embezzlement by bailee. Admittedly, the distinction between a bailee-bailor relationship and a trustee-

8. Appellant Amidon asserts that since the indictment against Menard fails to adequately state the elements of the crime of embezzlement by bailee, "then an indictment for aiding and abetting in the same language suffers from the same defects."

9. *Thomas v. State*, 522 P.2d 528, 530 (Alaska 1974) (footnotes omitted). *See* Alaska R.Crim.P. 7(c) which reads in part:

The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. . . . No indictment is insufficient, nor can the trial, judgment or other proceedings thereon be affected by reason of a defect or imperfection in matter of form in the indictment, which does not tend to prejudice the substantial rights of the defendant.

10. The text of this rule appears in note 9, *supra*.

11. Appellants have also argued that they were denied due process because ". . . the grand jury never made a finding of probable cause on the essential element specific intent to defraud." We have concluded that our holding regarding the sufficiency of the indictment, as well as the sufficiency of the evidence before the grand jury, is dispositive of this subsidiary specification of the appellants.

12. AS 11.20.330 provides:

Embezzlement by trustee. A trustee of property for the benefit of another, or for a public or charitable use, who, with intent to defraud, converts the property or any portion to his own use or benefit, or to the use and benefit of another not entitled to it, is punishable in accordance with § 280 of this chapter.

trustor relationship is not very precisely delineated in Alaska's statutes.

In *Maulding v. United States,* 257 F.2d 56, 17 Alaska 592 (9th Cir. 1953), a trust relationship between a mobile home dealer and a bank under the Uniform Trust Receipts Law of Alaska, ch. 40, SLA 1951, was found. There the court explained why no bailment was created by this relationship:

> A bailor has a general property interest in the property; an entruster has only a security interest. A bailee has no property interest in the bailment. Thus, upon repossession and sale by the bailor, the bailee has no interest in the proceeds other than as compensation for services performed while holder of the property. The trustee in a trust receipt transaction, on the other hand, usually has a property interest in entrusted property which entitles him to the surplus proceeds of any sale, upon repossession by the entruster.

> No debtor-creditor relationship exists between a bailor and bailee, and the bailee may return the property to the bailor without incurring liability. On the other hand, in a trust receipt transaction, a debtor-creditor relationship always exists between a trustee and his entruster. The trustee cannot discharge his obligation by returning the property.

257 F.2d at 61–62. The court in *Maulding* concluded that

> the trust receipt transaction here in question did not create a bailor-bailee relationship between the bank and Maulding. It follows that his conversion of the trailer which was the subject of the trust receipt could not be 'embezzlement by bailee,' within the meaning of the Alaska statute. (footnote omitted)

257 F.2d at 63.

*State v. Chapin,* 74 Or. 346, 144 P. 1187 (1914), provides further elucidation of the question at hand. There, a Mr. and Mrs. Grace gave $3,500 to the defendant and his partner, who were in business together as a mortgage and trust company for the purpose of the defendants investing the funds in first real estate mortgages. The Graces had known Mr. Chapin for about 20 years

and placed a great deal of confidence in his integrity. 144 P. at 1189–90. An attempt was made on behalf of the Graces to collect the money from the defendants, and judgment was obtained on part of the notes exchanged for the certificate of deposit, but the judgment could not be collected. 144 P. at 1192. The Oregon Supreme Court said, in upholding the conviction of Chapin for the crime of larceny by bailee under a statute somewhat similar to the current Alaska statute:

> A wrongful conversion of money of another intrusted to a bailee or a failure, neglect, or refusal to deliver, keep, or account for such money according to the nature of the trust would be a violation of the statute. . . . In other words, if Chapin was the bailee of the $3,500, the property of Mr. and Mrs. Grace, and wrongfully converted the same to his own use and failed to account for or deliver the same according to the nature of his trust, he would violate the statute, although at the time he appropriated the money he may have intended to speculate therewith and repay the same at some future time. (citations omitted)

144 P. at 1190. The *Chapin* court did not discuss the issue of whether the defendant was more appropriately characterized as a trustee. Although he was an officer and partner of a mortgage and trust company, a financial institution, the court held he was properly convicted of larceny by bailee.

Several of the comments to the Restatement (Second) of Trusts, section 5 (1957), Trust and Bailment are helpful in making a clear distinction between a bailment and trust. Subsections *a* and *b* state, in part:

> *a. The distinction between bailment and trust.* The owner of a chattel may give to another person possession of the chattel without giving him the title to the chattel. In such a case a bailment and not a trust is created.

> . . . . .

> *b. Manifestation of intention.* Whether a trust or a bailment is created upon the delivery of a chattel by the owner to another person for the benefit

of the former or of a third person depends upon the manifestation of intention of the parties. If the manifested intention is that the person to whom delivery is made shall thereby acquire the title to the chattel, the transaction creates a trust. If the manifested intention is that he shall not thereby acquire the title to the chattel, but that he shall acquire only the interest of a possessor, the transaction creates a bailment.

Other aspects of the bailment or trust and the parties thereto are described in subsections *e* and *f* of the comments to Restatement (Second), section 5:

> *e. Character of interests and duties.* The interest of a bailor is a legal interest, whereas the interest of a beneficiary of a trust is an equitable interest. The interest of a bailee is a legal interest, whereas the interest of a trustee is normally a legal interest although it may be an equitable interest.

> . . . . .

> *f. Transferees.* A bailee, having merely possession of and not title to the chattel, normally has no power to transfer the chattel free of the bailor's interest. On the other hand, a trustee of a chattel has power to transfer the chattel free of the trust of a bona fide purchaser, since the trustee has title to the chattel, although holding it subject to the equity of the beneficiary, and can transfer it free of equities.[13]

Guided by the foregoing authorities, we have concluded that the facts of this case demonstrate that a bailee-bailor relationship was established between Mrs. Wagner and Menard. The primary purpose of this relationship was to place the monies in question out of Mrs. Vetter's reach. Mrs. Wagner transferred the possession of the

---

**13.** We note the position of the Model Penal Code that a statutory scheme regarding embezzlement and similar larcenous offenses should include just one theft statute, broadly defined, with a grading of theft offenses for purposes of determining whether a specific act is a felony or misdemeanor and presumably for purposes of sentencing. The Model Penal Code section on "Theft by Failure to Make Required Disposition of Funds Received," section 223.8, reads in full:

> A person who purposely obtains property upon agreement, or subject to a known legal obligation, to make specified payment or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the actor's failure to make the required payment or disposition. An officer or employee of the government or of a financial institution is presumed: (i) to know any legal obligation relevant to his criminal liability under this Section, and (ii) to have dealt with the property as his own if he fails to pay or account upon lawful demand, or if an audit reveals a shortage or falsification of accounts.

Model Penal Code at 557–58. The Model Penal Code does not discuss separately the crime of embezzlement.

Professor Perkins asserts that a common statute, rather than piecemeal, narrowly-constructed statutes regarding embezzlement would "help the prosecuting officer who is handicapped by the fact that it is sometimes difficult to know in advance just what will be shown when the evidence is all in the record," and that an integration of larceny, embezzlement and false pretenses into a single offense would be the most helpful solution to the problem raised by appellants. Perkins, Criminal Law at 244.

Professor Perkins has suggested that what is needed is a statutory provision to the effect that:

> Embezzlement is the fraudulent appropriation by a bailee of money or goods held by him in bailment, or by a trustee of any funds or property held by him in trust. For the purpose of this statute a 'bailment' denotes the possession of money or goods, rightful as between the parties to the bailment, by one not its owner; and a 'trustee' includes one holding the title to property in trust for another, whether commonly denominated 'trustee,' 'agent,' 'broker,' 'factor,' 'attorney' or otherwise, if the property is held by him in a fiduciary relation.

This eliminates the requirement of trust, or even of delivery. It would include within this statutory offense every case in which all the elements of larceny are present except that the possession was acquired without trespass. It would permit a definition in this form:

> 'Embezzlement is the fraudulent appropriation of the personal property of another by one whose original acquisition did not involve a trespassory taking thereof.'

Perkins, Criminal Law, at 244–46 (footnotes omitted).

money, though not the legal interest, to her granddaughter. Carol Menard had no power to transfer the money free of Wagner's interest, which power is characteristic of a trustee. See Restatement (Second) of Trusts, section 5, comment f. Further, Amidon and Menard had no equitable interest in the monies. Amidon and Menard has possession of the money, but no legal interest in it. Thus, Menard was a bailee of Mrs. Wagner's money.

 In regard to the indictment in the case at bar, appellants further contend that the indictments were not supported by sufficient evidence. As we stated in State v. Parks,[14]

[A]n indictment [would] be insufficient and subject to dismissal if it appeared that no evidence was presented to the grand jury that rationally established the facts. . . . We now adopt that rule for this jurisdiction.

Under such a rule, the question is one of sufficiency of the evidence—whether it is adequate to persuade reasonable minded persons that if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by

14. 437 P.2d 642, 644 (Alaska 1968).

15. Accord, Newsom v. State, 533 P.2d 904, 906 (Alaska 1975); State v. George, 511 P.2d 1293, 1294 (Alaska 1973); Taggard v. State, 500 P.2d 238, 242–43 (Alaska 1972).

16. Although we have concluded that there was sufficient evidence presented before the grand jury to show a bailment, we note that the trial testimony reveals that at least the $10,000 loan later made to Mrs. Setzer did result in a Totten Trust deposit in a local bank. Mr. Setzer was to make his payments to Menard in trust for Wagner. However, Mrs. Wagner's trial statements challenge even this tentative conclusion since she was by her own admission simply trying to keep the money away from Grace Vetter. The purpose of a Totten Trust is to provide a means of tentative transfer of wealth where the trustee has no duties and may spend the money as if it were his own. Only upon the death of the trustee or upon an inter vivos conveyance does title pass to the beneficiary, who prior to that time can claim no rights.

Whether this Totten Trust exists or not is irrelevant for our grand jury inquiry since that matter does not appear to have been raised before the grand jury. In addition, the crime alleged here encompasses the act of refusing to

the judge or jury trying the offense.[15] (footnote omitted)

Our review of the record here persuades us that the indictments are supported by sufficient evidence. The facts which we have set out at the beginning of this opinion were brought before the grand jury through the testimony of Mrs. Wagner and the Setzers. In our view, this evidence was sufficient to establish the existence of a bailor-bailee relationship between Wagner and Menard, an intent on Menard's part to permanently deprive Wagner of the entrusted sums, and the fact that Amidon aided and abetted Menard in the commission of the embezzlement.[16] Concerning Menard's subsidiary contention that the evidence failed to show a refusal on her part to return Wagner's money, we find the evidence on this question sufficient.[17] The refusal by Amidon is clear; by claiming the money had already been given back, Amidon implied there remained no duty on Menard to pay. Further, even if Amidon's assertion could not be attributed to Menard, Menard's conduct, namely, her failure to actually deliver after demand was made, constitutes a refusal.[18]

deliver the remainder of the money, not the relatively small amount involved in the Setzer loan.

17. Mrs. Wagner further testified that Menard never actually refused outright to return the money. Rather, during the first of the two taped confrontations, she testified that Menard's comments were more or less as follows:

I have to do my laundry; the money is in Howard's and my name both; Howard will be home at 6:00 and you can talk to him then.

Mrs. Setzer's testimony corroborates this.

18. As the jury trial developed, Menard admitted that by the time Wagner left from the first confrontation, she (Menard) knew that Wagner was talking about all her money. At trial it was stipulated that at this time the money referred to was no longer in the bank. These stipulated facts, while irrelevant to the instant issue of the refusal, are relevant regarding what they reveal about the motive of the appellants. The money was at the house at 831 O'Connor where the confrontations took place.

As was mentioned previously, appellants have advanced the argument that the relationship between Wagner and Menard was that of

Amidon and Menard next specify as error the trial court's granting the state's motion for consolidation and the court's subsequent refusal to grant their motion for severance. Consolidation of the two cases was made pursuant to a motion by the state under Rule 13, Rules of Criminal Procedure.[19] Since this rule allows joinder when offense and offenders might have been joined in a single indictment or information, the propriety of joinder must be determined by reference to Rule 8, Rules of Criminal Procedure.[20] Appellants' rule-based challenge is that it was an abuse of the trial judge's discretion [21] to order joinder in this case.

▄▄▄▄▄ Rule 8, Rules of Criminal Procedure, distinguishes joinder of offenses and of offenders. The rule reads:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies, misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count. The disposition of the indictment or information as to one of several defendants joined in the same indictment or information shall not affect the right of the state to proceed against the other defendants.

For offenses to be joinable they must be of the same or similar character or be based on the same act or transaction. The predominant consideration here is whether joinder will serve the goals of trial economy or convenience.[22] For defendants to be joinable they must be alleged to have participated in the same act or transaction. It is firmly established in the case law that the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone.[23] The rule should be read as allowing joinder of defendants if they are alleged to have participated in (1) the same act or transaction constituting an offense of offenses, or (2) the same series of acts or transactions constituting an offense or offenses.[24] Thus, judged by these standards, the superior court did not abuse its discretion in ordering a joinder of the sepa-

a trust. They also contend that as part of the trust terms a condition precedent to demand was the termination of the Vetter litigation. As we view the evidence before the grand jury, there is no such evidence of a conditional irrevocable trust that we are compelled to hold, as a matter of law, that the refusal to deliver could not be a criminal act when unexplained or uncontradicted.

**19.** Alaska R.Crim.P. 13 parallels Fed.R.Crim.P. 13, and provides:

The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants, if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information.

**20.** *See* 1 C. Wright, Federal Practice and Procedure: Criminal §§ 212–13, at 425–30 (1969). Alaska R.Crim.P. 8(a) is the same as Federal Rule 8(a), and subsection (b) is substantially similar.

**21.** Exercise of Federal Rule 13 joinder power is an act of judicial discretion. *Turner v. United States,* 222 F.2d 926 (4th Cir. 1955), *cert. denied,* 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742.

**22.** *Baker v. United States,* 131 U.S.App.D.C. 7, 401 F.2d 958, 971 (1968); *Cataneo v. United States,* 167 F.2d 820, 822–23 (4th Cir. 1948). *See* Wright, *supra* note 20.

**23.** *E. g., United States v. Papadakis,* 510 F.2d 287 (2d Cir. 1975), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104; *United States v. Gentile,* 495 F.2d 626, 628 (5th Cir. 1974); *United States v. Bova,* 493 F.2d 33, 35 (5th Cir. 1974); *United States v. Roselli,* 432 F.2d 879, 898 (9th Cir. 1970). *See* Wright, n. 20 *supra,* § 144, at 318.

**24.** Wright, n. 20 *supra,* at 319.

rate indictments in the case at bar.[25] But this does not complete our discussion and disposition of the joinder-severance issue.

A more serious challenge to joinder is the constitutional one appellants raise with reference to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The thrust of appellants' argument here is that it was error for the trial judge not to order severance at the point where inconsistent defenses were alleged. The apparent inconsistency is that Menard asserts she never authorized Amidon to speak on her behalf. It was Amidon who stated at the second confrontation (on July 9, 1974) that the money involved had already been returned. An additional point of inconsistency concerns the apparent purpose of Amidon's attorney's cross-examination of witnesses. The record reveals that several times counsel sought admissions from witnesses to the effect that Amidon was not a bailee, and was not, in short, part of the arrangement.

*Bruton* involved a codefendant's refusal to testify at trial, thereby denying the defendant his constitutional right of confrontation and cross-examination when the codefendant's confession was introduced in evidence. The *Bruton* court held that an instruction admonishing the jury to consider the incriminating confession only against the maker could not cure the error.[26]

■ The key to appellant Menard's reliance on *Bruton* is her contention that she never authorized Amidon to speak for her at the second confrontation on July 9. We consider *Bruton* inapplicable in the factual setting of the instant case and hold that the superior court did not abuse its discretion in denying appellants' motion for severance. Our holding is reflective of our agreement with the state's position that it was not an abuse of discretion to deny the motion for severance because Amidon's extrajudicial statements are admissible against Menard under a recognized exception to the hearsay rule which renders appellants' reliance on *Bruton* inapposite.[27]

■ In *Kay v. United States,* 421 F.2d 1007, 1010 (9th Cir. 1970), the court stated:

It is well settled that admissions and statements of a co-defendant are admissible against another defendant even in the absence of a conspiracy count in the indictment, provided there is sufficient independent evidence of a concert of action between the defendants.[28]

---

**25.** *Compare United States v. Abrams,* 29 F.R.D. 178 (S.D.N.Y.1961).

**26.** One year later, Justice Douglas, speaking for a majority of the Court, held in *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), that admission of confessions given by codefendants who refused to take the stand was harmless error under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where one confessing defendant did take the stand. The evidence which the uncrossexamined confessions referred to was merely cumulative the Court held. The Court stated:

It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of [the non-testifying confessors'] confessions . . . . Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions.

395 U.S. at 254, 89 S.Ct. at 1728, 23 L.Ed.2d at 287–88.

**27.** For cases discussing the constitutionality of the hearsay exception permitting a co-conspirator's out-of-court statements to be admitted into evidence, see *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Snow,* 521 F.2d 730 (9th Cir. 1975); *United States v. Baxter,* 492 F.2d 150, 176–77 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

Appellant Amidon cannot complain of any extrajudicial statements attributed to Menard. The record shows that Menard testified at the trial and was cross-examined by counsel for Amidon. Thus, reliance on *Bruton* by Amidon is unavailable.

**28.** *See also Kelley v. United States,* 364 F.2d 911 (10th Cir. 1966); *People v. Niemoth,* 409 Ill. 111, 98 N.E.2d 733 (1951), *cert. denied,* 344 U.S. 858, 73 S.Ct. 97, 97 L.Ed. 666; McCormick, Law of Evidence § 267, at 646 (Cleary ed. 1972). *Contra United States v. Harrell,* 436 F.2d 606 (5th Cir. 1970).

In order for the statement of the codefendant to be admissible, the declaration must have been made while the joint undertaking was continuing, and must have been in furtherance thereof.[29] While the trial court may, in its discretion, vary the order of proof,[30] the existence of the joint undertaking must be proven independently to justify the admission of the codefendant's statement.[31] This latter prerequisite leads into a discussion of appellants' separate but related specification of error, more particularly, whether the superior court committed prejudicial error in admitting the July 9, 1974, statement of Amidon against Menard.

■ The preliminary question of whether a joint undertaking exists is for the trial court to determine. The quantum of proof required has been alternatively stated as proof sufficient to support a finding,[32] or as a fair preponderance of the evidence.[33] The showing necessary to support such a finding must be by evidence from another source.[34] In our view, there is sufficient evidence *aliunde* to support the trial court's decision that a joint undertaking existed and therefore statements of a codefendant are admissible if made during the continuance of the joint undertaking and in furtherance of the criminal endeavor.

■ Representative of the evidence the trial court could have used to support its decision to allow Amidon's statements to be introduced against Menard, and vice versa, is the following: Mrs. Wagner testified that prior to her leaving for surgery, Amidon met with her and discussed the amount of money she would need to go Outside and to what use it would be put; appellants stipulated during trial that Amidon participated with Menard in the withdrawal of some $80,000 from the Mt. McKinley Mutual Savings Bank; the money was finally placed in a bedroom of the house where both defendants lived. In addition, since the second confrontation basically involved Amidon as the speaker, while the first involved Menard, each could be used to support admission of the other: specifically, in connection with Mrs. Wagner's request at the first conversation that the money be returned to her, Menard asserted that Mrs. Wagner could talk to her or talk to Amidon. If Amidon were not a partner, there would be no need to talk to him and, in fact, talking to him would be irrelevant.

Thus, we conclude that the superior court did not err in admitting Amidon's statements against Menard, nor did it err in its

---

**29.** *E. g., Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); McCormick, *supra,* at 645.

**30.** *United States v. Halpin,* 374 F.2d 493 (7th Cir. 1967), *cert. denied,* 386 U.S. 1032, 87 S.Ct. 1482, 18 L.Ed.2d 594.

**31.** *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); 4 Wigmore, Evidence § 1079(a); McCormick, *supra,* at 645.

**32.** *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963).

**33.** *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969). Appellants' citation to *United States v. Ushakow,* 474 F.2d 1244 (9th Cir. 1973), for the proposition that conspiracy must be found by the trier of fact to exist beyond a reasonable doubt is misleading. The issue in *Ushakow* concerned jury instructions where the jury was given the task of determining whether a conspiracy existed. Here we are concerned with a preliminary factual determination by the trial judge.

**34.** *United States v. Perna,* 491 F.2d 253 (6th Cir. 1974), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2646, 41 L.Ed.2d 237; *United States v. Talbot,* 470 F.2d 158 (6th Cir. 1972).

The theory underlying the view that such statements are admissible rests on the notion best expressed in *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260, 275 (1917):

The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them.

refusal to grant appellants' motion for severance.[35]

Appellants next assert that the superior court improperly denied their motion for mistrial. In support of this specification of error, appellants point to three separate instances during Mrs. Wagner's testimony, the cumulative impact of which they contend denied them a fair trial. In response to the prosecution's question, "Did you make a decision about your money?", Mrs. Wagner replied, "Dale and Goldie [Setzer] . . . they said, 'Sue, I don't think they even intend to give you that money back.' "[36] Then, in response to a question regarding her will, Mrs. Wagner stated: "Mr. Belland had talked to me about making out a will and I didn't know just exactly what to do . . . because my granddaughter had used dope and I knew it. . . ."[37] Finally, in regard to the Vetter suit, Mrs. Wagner volunteered an alleged statement of Amidon: ". . . and Howard said, 'Well . . .' he says, '. . . there's a way of getting around that.' He said, 'You could have her put away'—have her done away with."[38]

**35.** In a closely related specification of error, appellants contend that it was prejudicial error for the trial court to have given instructions 11 and 12. These instructions concerned the use of statements of one defendant as evidence against the other. The instructions read, in part:

When two or more persons knowingly associate themselves together to carry out a common plan or arrangement, with the intent either to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means, there arises from the very act of knowingly associating themselves together with such intent, a kind of partnership in which each member becomes the agent of every other member.

So, where the evidence in the case shows such a common plan or arrangement, evidence as to an act knowingly done or a statement knowingly made by one such person, while the common plan or arrangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all.

. . . . . .

If and when it appears from the evidence in the case that such a common plan or arrangement did exist, and that a defendant was one of the members of the plan or arrangement, then the acts and statements by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the acts and statements may have occurred in the absence and without the knowledge of the defendant, provided such acts and statements were knowingly done and made during the continuance of the common plan or arrangement, and in furtherance of some intended object or purpose of the plan or arrangement.

Otherwise any admission or incriminatory statement made or act done by one person, outside of court, may not be considered as evidence against any person who was not present and did not see the act done, or hear the statements made.

. . . . . .

Except as provided in the preceding instructions the statements of one defendant are not to be considered by you in weighing the evidence against the other unless you are convinced beyond a reasonable doubt that a statement by one was adopted by the other as his own. You must weigh any such statements with caution and scrutinize the surrounding circumstances to determine whether they were made freely and voluntarily. A statement by one defendant may be attributed to the other where the defendant making the statement was named by the other defendant as one whose expected utterances the other approved beforehand, or, where the other, by his conduct, makes it clear beyond a reasonable doubt that the defendant making the statement was doing so as spokesman for both.

Appellants contend that there was no evidentiary basis for the giving of these instructions. Since we have concluded that there was sufficient evidence of a joint undertaking or venture, and that the instructions in question embody correct statements of law, we hold that the superior court did not err in giving these instructions.

**36.** The trial court overruled the objection lodged and denied a motion to strike.

**37.** The court instructed the jury to disregard the last comment.

**38.** The court instructed the jury to disregard the comments.

Upon appellants' motion for mistrial based on the cumulative prejudice of these three incidents, the court ruled:

All right. The motion is denied, I did instruct the jury to disregard those comments. I find that they are collateral matters and that jury will not become confused as to what the real issue is in the case and further, the fact that Defendant Menard's attorney asks a question which was equally as imma-

 We have previously held that the trial court is vested with "wide discretion" in determining whether a mistrial should be granted and its decision will be disturbed only if an abuse of discretion is shown.[39] In light of our review of the entire trial testimony, we have concluded that the superior court did not abuse its discretion in denying appellants' motion for mistrial. Here Mrs. Wagner's remark concerning what Mr. Setzer said cannot be characterized as prejudicial considering Mr. Setzer's repetition of the statements in the course of his own testimony. Mrs. Wagner's remark about "knowing" her granddaughter "had used dope" is equally unimpressive as a basis for granting a mistrial. First, there is no implication in the statement itself that Menard currently was using drugs. Second, the jury was instructed to disregard the remark. Finally, the jury was well aware of the witness' own prejudice in the whole matter, she being the prosecutrix and stating that she had "written off" her granddaughter. Mrs. Wagner's final remark, reporting Amidon's alleged suggestion of murder, is also not persuasive as a source for a mistrial. The jury was instructed to disregard the comment and the jury was well aware of Mrs. Wagner's own possible motives for fabricating such a remark. Consequently, we conclude that the trial court correctly ruled the grounds raised in support of the motion for mistrial were collateral and would not confuse or prejudice the jury.

Appellants, in a somewhat parallel specification, contend that the superior court erred in denying their motion for a new trial. As part of this motion, appellants incorporated by reference the three allegedly prejudicial remarks Mrs. Wagner made

while she was testifying. In addition, appellants objected to that portion of the prosecutor's closing remarks where he referred to Wagner as a "truthteller" and then, after quoting Dale Setzer as saying, "I think you've got your hands on about $80 grand . . . and you don't want to let go . . ..," asserted, "I think that's true. That's exactly what happened."

 Rule 33, Rules of Criminal Procedure, provides in part: "The court may grant a new trial to a defendant if required in the interest of justice." Thus, the errors alleged, namely, Mrs. Wagner's "inflammatory remarks" and prosecutorial misconduct in expressing personal opinions, must be of such magnitude that a new trial is called for in the interests of justice. In light of the entire evidentiary context of the case, we cannot conclude that the denial of the new trial motion was an abuse of discretion on the superior court's part.

We have previously discussed the alleged errors flowing from Mrs. Wagner's testimony in connection with the mistrial specification of error. Remaining is the prosecutor's remark, "I think that's true, that's exactly what happened."[40] In *Darling v. State,* 520 P.2d 793, 794 (Alaska 1974), we first adopted the rule prohibiting counsel from personally vouching for the credibility of a witness. In *Darling* we cited *People v. Perez,* 58 Cal.2d 229, 23 Cal.Rptr. 569, 373 P.2d 617, 627 (1962). In *Perez* the court stated the general rule to be that where misconduct is likely to result in prejudice and the court sustains the objection and properly admonishes the jury, the misconduct will not furnish sufficient grounds to justify the granting of a new trial. The obvious exception to this is where the misconduct is so prejudicial that curative instructions are useless

terial, irrelevant, and collateral—however, thinking of it in the light which I must, concerning: 'Is the jury going to be able to concentrate on the real issue in this case?', I find that the jury can.

**39.** *Tarnef v. State,* 492 P.2d 109, 117 (Alaska 1971); *Anderson v. State,* 438 P.2d 228, 233 (Alaska 1968); *Maze v. State,* 425 P.2d 235, 239 (Alaska 1967); *Steffa v. State,* 391 P.2d 11 (Alaska 1964); *Eaton v. State,* 390 P.2d 218

(Alaska 1964); *Harrison v. Garner,* 379 P.2d 948 (Alaska 1963).

**40.** As to the "truthteller" assertion, when this statement is examined, both in light of the whole evidentiary record in the trial and in the context in which it was made during final argument, we cannot conclude that the superior court erred in ruling the remark did not warrant a new trial. *See Darling v. State,* 520 P.2d 793, 794 (Alaska 1974).

in remedying the taint. In this regard the record shows that the following exchange took place immediately after the prosecutor's remark concerning Setzer's testimony:

MR. HACKETT: Your Honor, I'll object to the prosecutor giving his version of whether it's true or not. That's for the jury to decide.

THE COURT: You may proceed, Mr. Michalski.

MR. MICHALSKI: That is correct. That—what Mr. Hackett submits, it is for you to decide facts and not for you to take my arguments as facts. You look to those facts that you heard here in this courtroom—the evidence that the court said was admissible, and you decide whether this argument—my—this theory is correct. Even if that particular theory isn't correct, then you have to ask, was a crime committed? And has the State proved beyond a reasonable doubt the elements of this crime which the court will explain to you.

Thus, it can be seen that the minor prejudice engendered by the prosecutor's improper remark was cured by his subsequent explanation. In addition the jury was instructed that:

Arguments, statements, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but are not evidence.

In light of the entire record and counsel's further comments with regard to the questioned statement, we conclude that the prosecutor's remark was harmless error.[41] Thus, we hold that the superior court did not err in its denial of appellants' motion for a new trial.

Appellants have advanced as another specification of error the contention that the superior court should have granted their motion for a judgment of acquittal. They argue that under the evidence and inferences most favorable to the state, no reasonable man could have found them guilty.

The standard of appellate review governing denials of motions for judgments of acquittal is as follows:

'[The Supreme Court] must view the evidence and the inferences to be drawn therefrom in a light most favorable to the state' . . . [and] determine whether 'fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt.'[42]

Judged against this criterion and based upon our study of the evidence in the case, we find no error on the part of the superior court in its denial of appellants' motion for judgment of acquittal.

 Another action of the superior court which appellants attack in this appeal is the superior court's refusal to grant their motion for new trial which was grounded on the assertion that the verdicts were against the weight of the evidence. Unlike its function in passing upon a motion for judgment of acquittal, the trial court, in deciding a motion for new trial on the ground that the verdict is contrary to the weight of the evidence, may weigh the evidence and determine the credibility of witnesses.[43] Based on our review of the record, we cannot say that the superior court committed an abuse of discretion in denying appellants' motion for new trial.[44]

---

**41.** *Love v. State,* 457 P.2d 622, 632 (Alaska 1969).

**42.** *Davis v. State,* 501 P.2d 1026, 1027 (Alaska 1972). *Accord, Trounce v. State,* 498 P.2d 106 (Alaska 1972); *Beavers v. State,* 492 P.2d 88 (Alaska 1971).

Appellants urge, in addition, that since most of the evidence involved was circumstantial, a fair addition to the standard would be that the circumstantial evidence must be such as to exclude every reasonable hypothesis other than that of guilt. This standard was most recently

rejected by this court in *Jacobson v. State,* 551 P.2d 935, 939–40 (Alaska 1976).

**43.** 2 C. Wright, Federal Practice and Procedure: Criminal § 553, at 486 (1969).

**44.** *Compare Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 724 (Alaska 1975), wherein it was stated:

[I]n reviewing a trial court's exercise of discretion upon a motion for new trial, we must examine the record and determine whether 'the evidence to support the verdict was com-

■ This brings us to the last aspect of this appeal. Appellants claim that the sentences of three years imprisonment they received are excessive and do not appear to be the result of a measured application of recognizable sentencing standards. After the verdicts were returned, presentence investigations were conducted and presentence reports filed. The author of these reports noted that neither appellant had any prior criminal record, and that appropriate punishments for each defendant would be a three-year suspended sentence, together with the requirement that appellants pay all prosecution and trial costs of the state as well as Mrs. Wagner's cost resulting from the embezzlement.[45] The author of the presentence reports further stated that "[f]rom a rehabilitation standpoint . . . neither [Amidon nor Menard] will let themselves get involved in this type of matter again";[46] and that it

was his belief that a prison term would do more harm than good for either Amidon or Menard.

Our review of the evidence in the case at bar, the presentence report, and the sentencing proceeding has convinced us that the superior court was clearly mistaken in imposing three-year prison sentences for each offender. Given the highly unusual factual situation of the case at bar, the fact that the crime did not involve any physical danger to other persons, the fact that substantially all of Mrs. Wagner's money was returned to her, the fact that neither Amidon nor Menard have previous criminal records, we are of the view that three years imprisonment is too harsh a sanction. In the factual context of this record, if any term of imprisonment is warranted, such term of imprisonment should not exceed one year.[47]

pletely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust.' *Ahlstrom v. Cummings,* [388 P.2d 261, 262 (Alaska 1964)]. If we find that 'there was an evidentiary basis for the jury's decision,' then the denial of a new trial must be affirmed. *Olson v. McRae,* 389 P.2d 576, 577 (Alaska 1964). (footnote omitted)

**45.** At the sentencing hearing respective trial counsel for appellants each addressed the probation officer's recommendation that as punishment appellants pay all costs of the state and Mrs. Wagner resulting from the offense.

**46.** The superior court's sentencing remarks, in full, are as follows:

THE COURT: All right. Please stand, Ms. Menard, along with Mr. Amidon. I find that you are guilty of the respective crimes with which you are charged, based upon the verdict of the jury. I find that it was a strong case, not a technical violation of the law. That it is a first offense for both of you. I find that Ms. Menard was not truthful on the witness stand. In material respects, I find that both of you played upon Mrs. Wagner's mind by saying—making comments like, 'What money, I gave you that money before you went Outside,' etcetera. I find that you came to think of this as your money; that greed, which is a human emotion and has been around since the time of Moses, played a large part, if not the total motivation. That you breached a strong trust, that this wasn't a spur of the moment emotional crime, but one involving premeditation and calculation, that society is built upon trust and that this

embezzlement statute is one of those statutes which society has enacted—the legislature has enacted in order to foster that belief and trust. I find that the societal norms need to be reinforced. Community condemnation, if there is any case where deterrence on others of committing similar type crimes has any effect, it's in a crime like this, where there's been planning, premeditation, calculation, and thought. I believe that you need to be discouraged from engaging in this in the future, other people need to be discouraged. There is significant financial danger to the public from commission of such crimes, and of course, I recognize that there was no threat of bodily harm, which is significant. I don't find that it's appropriate for a suspended imposition of sentence, I find that the reinforcement of societal norms overcome that. And I sentence both of you to serve 3 years with no part of that suspended, subject to parole at the discretion of the parole board, and I'll stay the execution of this sentence for 20 days or, if appeal is filed—pending appeal. I also want to advise you that you have the right to appeal this sentence to the supreme court based upon its harshness, and your attorneys will discuss that with you, and that appeal must also be filed within 30 days, the same as the appeal from a conviction. Do you have any questions on behalf of your client, Mr. Hackett?

**47.** *Compare Andrews v. State,* 552 P.2d 150 (Alaska 1976).

The convictions of appellants are Affirmed. The sentences imposed by the superior court are vacated and the matters remanded for further sentencing proceedings in accordance with this opinion.

---

BOOCHEVER, Chief Justice, concurring.

While I concur with the results in this case, I do so on one issue for reasons different from those stated by the majority.

I cannot agree with the majority's application of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), or with its conclusion that the joint undertaking exception to the hearsay rule automatically satisfies the right to confront witnesses. Furthermore, I see no need to reach that issue in this case.

During the course of the felony, Amidon made statements denying any knowledge of the money and indicating that the money had been returned. These statements were introduced against Menard in a joint trial in which Amidon did not testify and was not subject to cross-examination. Relying on the case of *Kay v. United States,* 421 F.2d 1007, 1010 (9th Cir. 1970), the majority seems to indicate that Menard's rights to confrontation [1] are automatically satisfied because Amidon's statements fall within the recognized exception to the hearsay rule as statements of a codefendant made in furtherance of a joint undertaking.

A Ninth Circuit case decided after *Kay* holds that even conceding sufficient evidence to satisfy the foundational requirements of the joint undertaking exception, statements still might be excluded because their admission denies the constitutional rights to confront and cross-examine the accuser. *United States v. Snow,* 521 F.2d 730 (9th Cir. 1975). The court stated:

The fact that evidence is admissible under the co-conspirator exception does not automatically demonstrate compliance with the Confrontation Clause. *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

The *Snow* decision explains that the test is whether:

under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declarations.

*Snow, supra* at 734.

In this case, I can concur because under the standard established in *Snow,* Menard was not denied her rights of confrontation. It is clear that Amidon's statements were not being introduced to prove the truth of matters asserted in the statements. To the contrary, everyone recognized that Amidon's statements were false and, in fact, that is why the state introduced them. Confronting Amidon as to those statements would have minimal value since Menard had no need to prove the statements were false. Menard presumably could have cross-examined Amidon at trial as to whether or not the statements were actually said, but the same effect could probably be obtained by cross-examining the witnesses who testified to hearing the statements. Under these circumstances, it is my opinion that the unavailability of the declarant for cross-examination did not "deprive[d] the jury of a satisfactory basis for evaluating the truth of the extrajudicial declarations." *Snow, Id.*

While the above analysis leads me to concur with the majority opinion in this case, I believe there are circumstances when the joint undertaking exception to the hearsay rule might not automatically resolve a defendant's rights to confront witnesses and

---

1. Art. I, § 11 of Alaska's Constitution and the sixth amendment to the United States Constitu-tion guarantee a defendant the right to be confronted with the witnesses against him.

cross-examine.[2] Since we need not decide whether or not to follow the rationale of *Snow* in this case, I think the question remains open.

We have described the right to cross-examination to be ". . . as beyond any doubt the greatest legal engine ever invented for the discovery of truth."[3] I would caution against unnecessarily adopting a broad rule which, under a different fact situation, could conflict with a defendant's fundamental rights to confrontation.

BURKE, Justice, dissenting in part.

I dissent from that portion of the majority opinion holding that the superior court was clearly mistaken in imposing sentences of three years' imprisonment. I would affirm the judgment in all respects. Otherwise, I concur.

---

**2.** One example would involve a situation in which it was alleged that A and B had jointly engaged in a bank robbery. During the robbery, robber A implicated robber B by stating that B, who was not present at the bank, had planned the entire operation. If this statement is introduced at trial through the testimony of C, who had overheard it, B might have a constitutional right under *Bruton, supra,* to confront and cross-examine robber A. Unlike Menard, robber B might have an interest in attacking the truth of the hearsay statement. The mandates of *Bruton* should not be avoided automatically simply because a statement was made during the commission of a joint undertaking.

**3.** *Evans v. State,* 550 P.2d 830, 836 (Alaska 1976).