Timothy HAWLEY, Appellant,

v.

STATE of Alaska, Appellee.

Robert WALL, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 4200, 4273.

Supreme Court of Alaska.

July 25, 1980.

Vincent Vitale, Anchorage, for appellant Hawley.

William P. Bryson, Drathman, Weidner & Bryson, Anchorage, for appellant Wall.

Leonard M. Linton, Jr., Asst. Dist. Atty., Larry R. Weeks, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Justice.

This case involves a joint undertaking to sell cocaine. Appellant Robert Wall was convicted of the sale of a "narcotic drug," cocaine, in violation of AS 17.10.010.[1] Appellant Timothy Hawley was convicted of an attempted sale and a sale of cocaine in violation of the same statute. They appeal their convictions, alleging numerous errors. They contend that: (1) the existence of a joint undertaking was not established by sufficient independent evidence and, therefore, statements made by a co-defendant were not admissible against them; (2) the evidence was insufficient to support a conviction; (3) the trial court erred in denying their motions for mistrial because the prosecution failed to provide discovery in accordance with Criminal Rule 16; (4) the trial court erred in failing to grant their motions for severance; (5) the trial court erred in allowing the three co-defendants only one peremptory disqualification of a judge. Hawley also argues that the trial court abused its discretion by admitting irrelevant evidence. Additionally, they claim that their respective sentences are excessive. We affirm both their convictions and sentences.

Since one of the contentions is that there was insufficient independent evidence to establish a joint undertaking so as to permit introduction of out-of-court statements made by a co-defendant, we find it necessary to detail some of the convoluted facts.

On September 20, 1977, Officers Novaky and Higgins, acting as undercover agents, met with Paul Poirier to arrange a purchase of cocaine. Poirier was unable to sell them cocaine, but said a woman named Ann could. He remarked that the source was a man living in the Rabbit Creek area, but did not mention his name. Novaky told Poirier that they wanted to purchase three to six ounces of cocaine. The officers arranged to telephone Poirier the next day.

When the officers next spoke to Poirier, he explained that Ann wanted to be sure they had the money. The officers agreed to rendezvous at Shakey's Pizza Parlor. Obtaining $15,500.00 in marked money, they met Poirier and Ann Laschober at Sha-

---

1. AS 17.10.010 provides:

 *Acts prohibited.* It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug as authorized in this chapter.

key's.[2] The officers showed Laschober the money and told her they wanted to purchase cocaine. Laschober and the officers discussed a price for the cocaine of $2,150.00 per ounce. She stated that she knew a supplier, but did not mention a name. The parties agreed to call the following day.

On September 23, the officers met Poirier and Laschober at Hewitt's Drug Store. Laschober informed the officers that the supplier had not arrived. She asked them if they would wait while she and Poirier left for a few minutes. Approximately an hour later, Poirier returned.[3] Shortly afterward a man, later identified as Timothy Hawley, and Laschober drove into the parking lot in a white Ford Bronco, Alaska license plate number ACC 816. Hawley got out of the Bronco and walked into the drugstore. Laschober approached the officers and got into their car. She indicated that the man in the Bronco neither had the cocaine nor wanted to meet them because he was paranoid. During this conversation, Laschober also told the officers that her source's drugs were fronted to him.[4]

During their conversation, Laschober suggested that the officers give her their car and the money and she would get the drugs, but the officers rejected her proposal. She then told them that she would have to talk with Hawley, who at that point had left the drugstore and was waiting in the Bronco.

After talking with Hawley, Laschober returned and said that they should go to her apartment. She would call from there to make sure the source had cocaine and the parties could then arrange to exchange the money for the drugs.

During this second conversation Hawley drove off in the Bronco by himself. He was placed under surveillance by cars and a spotter in an airplane. He drove to his residence in Rabbit Creek. A registration check of the Bronco identified the owner as Hawley.

The officers went to Laschober's apartment. Laschober left the apartment to call her source, and returned to tell the officers that her source did not have the cocaine. The parties then agreed to an arrangement whereby Laschober would purchase one ounce from the source and bring it to the officers. If, following a test, it was suitable, they would buy the rest. The officers aborted the sale because they found a note from other investigators on their car stating that they must cancel the deal for now. Consequently, they told Laschober that they were going to Fairbanks and that they would call her when they got back to Anchorage.

On September 27, the officers received a phone call from Laschober and they agreed to meet her the following night at Rabbit Creek Inn. The procedure for trading the money for the drugs was similar to the plan the parties had discussed before. Laschober would take money for one ounce. Using the officers' car, she would obtain the cocaine, and return for two more ounces later. The price per ounce would be $2,200.00.

On September 28, the officers met Poirier and Laschober at her apartment. On their way to Rabbit Creek Inn, they stopped so Laschober could call her source. Since her source was not home, the officers returned to their office.

Shortly thereafter, Laschober called and said the deal was ready to go. The officers picked up Laschober and Poirier and drove to the Rabbit Creek area. Simultaneously, other officers were dispatched to maintain surveillance on the Hawley residence and roads between Rabbit Creek Inn and the Hawley residence. Novaky, Higgins, Laschober and Poirier arrived at the Inn shortly before 9:00 p.m. Higgins gave Laschober $2,200.00. Laschober left the Inn with the marked money in Higgins' Volare auto-

---

2. Other officers went to the area and were dispersed for surveillance.

3. When referring to the source, Laschober did not use any particular name.

4. When drugs are fronted to a person, that person receives the drugs without initially paying for them. The drugs are paid for after the person has sold them.

mobile and headed south on Old Seward Highway.

Investigator Adams was stationed at the Hawley residence. At 8:45, he saw a white Opel and the Bronco driven away from the residence. He followed what he believed to be the Opel, but it was the wrong car. At approximately 9:00 p. m., he saw the Opel coming in his direction. The driver was Hawley and the passenger was a female. Moving into a turnoff, he met Officer Brandlen. He saw the Bronco coming up the hill, but could not identify the driver.[5] Thereafter, he returned to the Hawley residence.

Meanwhile, Novaky and Higgins waited in the Inn. They observed a white Ford Bronco enter the parking lot. Although the officers could not positively identify the driver, they did not think that it was Hawley because the man was not wearing glasses. About 25 minutes after 9:00, Laschober returned and gave Higgins an ounce of cocaine. Higgins field-tested the cocaine. At that point, Laschober referred to her source as "Tim."

Returning to the residence, Adams saw the Bronco, but not the Opel. In the house he saw Hawley, a woman named Renee Cole, and an unidentified white male. Shortly thereafter, the Opel returned to the house. At 9:45, Hawley and a white male came out of the house and departed in the Bronco. Later, the Bronco returned and pulled back into the driveway. Hawley and Wall got out of the Bronco. Wall entered the house and, shortly thereafter, came out on the porch.

About 10:00 p. m., Adams observed Wall and Hawley leave the house. Hawley got into the Bronco; Wall got into the Opel.

Both left. After meeting with Brandlen, Adams returned to the house. He watched the house until he was notified that he should stop the Opel.

About the same time, Higgins gave Laschober $4,400.00 to buy two more ounces of cocaine. She left with the money.

Officer Brandlen, from his position, saw the Bronco going down the hill with only Hawley in it. Then he saw it go up the hill with Hawley and Laschober in it. He followed the car and observed the Bronco turn off on a side road, disappearing from his sight. He continued up the hill, and within ten minutes observed Hawley alone in the Bronco going past his position and continuing up the hill. Brandlen followed the Bronco in order to arrest Hawley.

As he followed the Bronco, it approached the Opel which was parked on the roadside with its parking lights on. As the Bronco neared the Opel, the Bronco slowed, but did not come to a complete stop. Brandlen saw no movement indicating that anything passed between the vehicles. The Opel proceeded down the hill. The officer started his red light and the Bronco stopped. Brandlen placed the driver, Hawley, under arrest. He conducted a patdown search of Hawley and found $1,157.00 in unmarked money.

Brandlen informed Adams that the Opel was coming down the hill toward him. Adams saw the Opel coming and attempted to block its path with his car. The Opel, however, went around the car onto the shoulder of the road, and passed Adams' car. Adams pursued the Opel at a rate of speed between 80 and 85 miles per hour. Adams requested a roadblock, which was set up, and the Opel

---

**5.** Officer Brandlen corroborated Adams' observations, although his time frame was different. Brandlen testified that, between 7:30 and 8:00 p. m., he observed a green Volare operated by neither Higgins or Novaky in the Old Seward Highway area. He also observed the Opel pass his position and go up the hill. He followed the vehicles and saw the Opel and the Volare in a small turnoff. In the Opel was Hawley; in the Volare was Laschober. He proceeded past the cars and parked his vehicle. Several minutes later, he saw the Opel driving up the hill with two occupants, Hawley and Laschober. Shortly thereafter, he met Officer Adams. They observed the Bronco driving up the hill. The driver had dark hair and a moustache, but could not be identified. Officer Adams departed and went up the hill, and Officer Brandlen went down the hill where he saw the Volare. Subsequently, the Opel came down the hill with Laschober and Hawley. A minute later the Opel drove back up the hill with only Hawley in it. Later, Brandlen learned that the Volare had returned to the Inn.

was stopped. The driver was placed under arrest. The driver said his name was Jeffrey Lee Foster, and he produced a California driver's license bearing that name. In fact, the license was false. Foster's real name is Robert Wall.[6] Wall was patted down and $3,965.00 in cash was found on his person. None of it, however, was marked money.

When Laschober returned to the Inn after the meeting, she did not have the additional cocaine. She stated that Tim only had a five-ounce bag of cocaine and would have to "cut" a two-ounce bag. Laschober and Poirier were arrested.

The following day, the Hawley residence was searched. "Multiple persons" were apparently living in the house. Neither cocaine nor marked money was found. The Opel and the Bronco were also searched, but no evidence was found.

On September 29, the police received reports that children had found one-hundred-dollar bills in the snow along Golden View Drive, the road upon which Officer Adams had pursued the Opel. Adams, however, did not see any objects thrown from the Opel during the pursuit. Serial numbers of the recovered bills matched those of the funds given to Laschober to purchase the one ounce of cocaine.

The following additional facts were established at the trial. On September 27, the Opel was rented to a person utilizing a false California driver's license in the name of Jeffrey Foster. That person gave the Anchorage Westward Hilton as his local address. In fact, Jeffrey Foster was not registered at the Anchorage Westward Hilton. Finally, there was undisputed testimony that Robert Wall was in Fairbanks on September 23 and 24, the dates when the transaction was originally to have occurred, but was aborted because the officers were unable to continue. After a joint trial with Laschober, Hawley and Wall were found guilty.[7]

## THE SUFFICIENCY OF THE EVIDENCE OF A JOINT UNDERTAKING

Wall and Hawley argue that the prosecution failed to establish sufficiently by independent evidence the existence of a joint undertaking and, therefore, Laschober's statements concerning them were not admissible against them. Moreover, they contend that if Laschober's statements are not admissible, the evidence is insufficient to support a verdict and the convictions should be reversed. We find that there was sufficient independent evidence to justify the admission of Laschober's statements and the evidence is sufficient to support the verdict.

In *Amidon v. State*, 565 P.2d 1248 (Alaska 1977), this court defined the circumstances under which hearsay statements by a co-defendant are admissible:

In order for the statement of the codefendant to be admissible, the declaration must have been made while the joint undertaking was continuing, and must have been in furtherance thereof. While the trial court may, in its discretion, vary the order of proof, the existence of the joint undertaking must be proven independently to justify the admission of the codefendant's statement. . . .

The preliminary question of whether a joint undertaking exists is for the trial court to determine. *The quantum of proof required has been alternatively stated as proof sufficient to support a finding, or as a fair preponderance of the evidence. The showing necessary to support such a finding must be by evidence from another source.*

565 P.2d at 1259 (footnotes omitted) (emphasis added). In *Amidon* we did not elaborate on which standard of proof is required

---

6. Both Novaky and Higgins admitted that neither of them had ever heard the name "Wall" or "Foster" used in connection with any negotiations leading up to the eventual purchase of cocaine. Furthermore, Wall's fingerprints were not found on the one-ounce bag of cocaine given to Higgins by Laschober.

7. Laschober was also found guilty of the sale of cocaine, but her appeal is not before us.

to show the independent existence of the joint undertaking.[8] Although there is no indication in the record what standard the trial court applied here, we will assume that it was the preponderance of the evidence standard.[9] The state did not argue that a lesser standard should be used, nor did the defendants object to the use of the standard the judge applied.[10]

◼ We find the evidence, independent of the co-defendant's statements, sufficient to establish a joint undertaking to traffic in narcotics[11] and Wall's connection with the undertaking. Under a false name, Wall rented the Opel used by Hawley to meet Laschober. On the night of the transaction, he was seen at Hawley's residence and in the Bronco with Hawley. When Officer Adams tried to stop Wall, he fled at a high rate of speed until stopped at a roadblock. Marked money was found along the path of Wall's flight. To say the least, it is highly improbable that anyone other than Wall would have had the motive to throw one-hundred-dollar bills alongside the road. Additionally, at the time of his arrest, Wall had in his possession approximately $4,000

in cash, which tends to indicate involvement in drug dealing. (See discussion *infra* at page 1361.) We conclude that there was sufficient independent evidence to establish Wall's connection with the joint undertaking. Hence, Laschober's statements were admissible against him and the evidence is sufficient to support his conviction.

◼ There is also sufficient independent evidence to connect Hawley to the joint undertaking. At the Hewitt's Drug Store meeting, Laschober was initially unable to deliver the cocaine. After the arrival of Hawley, she was able to discuss the sale arrangement, but only following a conversation with Hawley. The sale did not occur on that day because of problems the police encountered, but Laschober indicated an ability to acquire the drugs. On September 28, the sale occurred. Each time Laschober received money from the officers, she immediately drove off and met with Hawley. After the first meeting, she returned with cocaine. After the second, she did not return with cocaine but only because it had not been "cut" into the proper quantity. Moreover, after the first meeting between

8. The two standards are the preponderance of the evidence standard and the prima facie standard. The difference between the two standards has been described in *United States v. Trotter*, 529 F.2d 806, 812 n. 8 (1976) (citation omitted):

> The requirement of prima facie proof is less stringent than that of a preponderance of the evidence. The former requires only enough evidence to take the question to the jury whereas the latter requires "proof which leads the jury to find that the existence of the contested fact is more probable than its non-existence."

9. Under our new Evidence Rules, we will follow the preponderance of the evidence standard to prove the existence of a joint undertaking. In this regard, we find the reasoning of the following courts persuasive: *United States v. Enright*, 579 F.2d 980, 982–86 (6th Cir. 1978); *United States v. Petrozziello*, 548 F.2d 20, 22–23 (1st Cir. 1977). *See also United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978); *United States v. Trowery*, 542 F.2d 623, 627 (3rd Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); *United States v. Stroupe*, 538 F.2d 1063, 1066 (4th Cir. 1976); *United States v. Wiley*, 519 F.2d 1348, 1350–51 (2d Cir. 1975), *cert. denied sub nom. James v.*

*United States*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). *But see United States v. James*, 590 F.2d 575, 581 (5th Cir. 1979) (en banc). The *Enright* and *Petrozziello* courts abandoned the use of the prima facie test and adopted the preponderance of the evidence test. The basic reason for the change was that the new Federal Rules of Evidence give greater responsibility to the trial court to determine the admissibility of evidence, *see* Fed.R.Evid. 104(a) and (b). "[A] higher standard is implicit in the judges' new role." 548 F.2d at 23. Rules 104(a) and (b) of the recently adopted Alaska Rules of Evidence are identical to the Federal Rules of Evidence 104(a) and (b), and we believe that the reasoning of these opinions should be followed.

10. Even assuming that a lower standard was used, in the absence of an objection, the use of the prima facie standard is not plain error. *See United States v. Enright*, 579 F.2d at 986; *United States v. Petrozziello*, 548 F.2d at 23.

11. Laschober and Poirier's actions alone establish a joint undertaking to sell cocaine. The only real question is whether Wall was connected with that undertaking.

Laschober and Hawley, he and Wall were seen together both at Hawley's house and in the Bronco. The marked money which had been given to Laschober was subsequently found along the road where Wall attempted to evade arrest. In our view, the continuing relationship with Laschober and the connection with Wall sufficiently established by a preponderance of the evidence that Hawley was a member of the joint undertaking. Consequently, the statements were admissible and we hold that the evidence was sufficient to support his conviction.[12]

## MOTION FOR MISTRIAL

■ After the trial began and the state had called all but one of its witnesses for its case in chief, the prosecutor disclosed, out of the presence of the jury, that immediately after her arrest Laschober made a confession to district attorney Glen Anderson and Officer Needham. Laschober stated in essence that "the reason she had sold the cocaine was because she needed clothing for her child, food for her family and so forth and so on . . . ." The statement had

been reduced to writing, but had never been sent to the district attorney's office. The prosecutor represented that he first learned of the statement moments earlier while he was interviewing Needham, who was about to testify.

Both Hawley and Wall moved for a mistrial on several grounds. The court denied the motions but granted a continuance and refused to allow the prosecution to use the confession at trial. The appellants contend that it was error to deny their motions.

Criminal Rule 16(b)(1)(iii)[13] clearly requires the disclosure of statements of co-defendants. Furthermore, the statement was in the prosecutor's control or possession since it was in the possession of an investigating officer.[14] Consequently, the prosecution failed to comply with Criminal Rule 16 and the superior court's discovery order.

We have previously stated:

The proper procedure for a trial court faced with prosecution failure to disclose to the defense evidence that it is required to provide, until just before it plans to

---

**12.** We consider the facts of the present case distinguishable from all of the following cases: *United States v. Stroupe*, 538 F.2d 1063 (4th Cir. 1976) (*no evidence of a continuing relationship and no money recovered*); *United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974) (no evidence of a continuing relationship, no money recovered, no substantial attempt to evade arrest and no use of false identification); *United States v. Frol*, 518 F.2d 1134 (8th Cir. 1975) (no recovery of marked money and no flight from arrest). The facts of the present case are more similar to the facts presented in *United States v. Macklin*, 573 F.2d 1046, 1050 (8th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); and *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 1346 (1977). In *Macklin* and *Carlson*, the Eighth Circuit held that there was sufficient independent evidence of a conspiracy where repeated meetings took place between the defendant and the individual making the sale at times corresponding to the times of the sale, even though the officers did not witness an actual exchange of drugs and there was no indication of flight or that any marked money was recovered. *See also United States v. Lambrus*, 564 F.2d 26 (8th Cir. 1977).

**13.** Rule 16(b)(1), Alaska R.Crim.P., provides in part:

Except as is otherwise provided as to matters not subject to disclosure and protective orders, the prosecuting attorney shall disclose the following information within his possession or control to defense counsel and make available for inspection and copying:

. . . . .

(iii) Any written or recorded statements and summaries of statements and the substance of any oral statements made by a codefendant;

**14.** *See* Rule 16(b)(3), Alaska R.Crim.P., which states:

*Information Tending to Negate Guilt or Reduce Punishment.* The prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense or would tend to reduce his punishment therefor.

*See also Ortega v. People*, 162 Colo. 358, 426 P.2d 180, 182 (1967), where the court held that "statements in possession of the police . . . are within the 'possession or control' of the prosecuting attorney so as to meet the requirements of Rule 16 [which is similar to Alaska's Rule 16]."

use such evidence, is to grant a continuance long enough to allow the defense attorney adequate time to prepare.

*Des Jardins v. State*, 551 P.2d 181, 187 (Alaska 1976) (footnote omitted).[15] Here, not only was a continuance granted, but the prosecution was foreclosed by the court from using the statements.

Nevertheless, the appellants argue that, under the circumstances of this case, the continuance was not an appropriate remedy and that a mistrial should have been declared.[16] They argue that the failure to provide the required discovery was prejudicial error for two reasons.

First, they argue that if the confession had been disclosed, it is likely that Laschober would have pled guilty and, if she did, she would have been available for cross-examination and to provide exculpatory information. This argument is erroneous because the evidence against Laschober was already overwhelming without the confession. It does not seem likely that the revelation of the confession would have affected her decision to plead guilty. Moreover, Laschober would probably have been aware of her own prior statement.[17]

Second, the appellants argue that if the confession had been revealed, the *Bruton* rule required the granting of their motions to sever. This argument is fallacious because Laschober's confession in no way inculpates Wall or Hawley, and, in any event, it was not introduced into evidence. There-

fore, *Bruton* is inapplicable.[18] We conclude that the trial court did not err in denying the motion for a mistrial.

## SEVERANCE

Both Hawley and Wall contend that the trial court erred in denying their motions for severance. They contend that severance was mandated because: (1) the introduction of co-defendants' admissions implicating them, where the co-defendant would not take the stand, denied them their sixth amendment right to confront and cross-examine witnesses against them, and (2) co-defendant Laschober possessed exculpatory information as to Wall and without a severance Wall would be foreclosed from calling her.

### A. Severance for Confrontation

Wall contends that his right to confrontation was violated because Laschober's statement that Hawley's drugs were fronted to him was admitted without providing Wall an opportunity to cross-examine Laschober. Similarly, Hawley contends that his right to confrontation was violated because Laschober's statement that "Tim"[19] was her source was admitted without providing him an opportunity to cross-examine Laschober.

As discussed above, these statements may be admissible despite the hearsay rule because they are statements made by a co-defendant during the course of and in furtherance of a joint undertaking.[20] Never-

---

**15.** *See also Stevens v. State*, 582 P.2d 621, 624 n. 9 (Alaska 1978); *Scharver v. State*, 561 P.2d 300, 301 (Alaska 1977).

**16.** *See Howe v. State*, 589 P.2d 421, 424 (Alaska 1979); *Christie v. State*, 580 P.2d 310, 312 n. 2 (Alaska 1978).

**17.** See the discussion under the "Severance for Confrontation" section of this opinion for additional reasons we have concluded that the state's failure to provide discovery was nonprejudicial.

**18.** *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *United States ex rel. Mascia v. Zelker*, 450 F.2d 166, 168 (2d Cir. 1971), *cert. denied*, 406 U.S. 959, 92 S.Ct. 2066, 32 L.Ed.2d 346 (1972); *Benefield v. State*, 559 P.2d 91, 95 (Alaska 1977).

**19.** Hawley's first name is Timothy.

**20.** Although traditionally such statements were an exception to the hearsay rule, under the newly adopted Alaska Rules of Evidence they are defined as nonhearsay. Alaska R.Evid. 801(d)(2)(E). Since the trial here preceded the adoption of the new evidence rules, we shall refer to statements made in furtherance of a joint undertaking as an exception to the hearsay rule. We believe that even though a hearsay statement fits within an exception, it may nevertheless violate the requirements of the confrontation clause. *See generally Benefield v. State*, 559 P.2d 91 (Alaska 1977); Alaska R.Evid. Art. VIII, Introductory Reporter's Comment, at 215–16.

theless, we must decide whether the introduction of these statements violated the appellants' right to confrontation.

The right to confrontation in all criminal matters is guaranteed to the accused by the sixth amendment to the United States Constitution.[21] This right is made applicable to the states through the fourteenth amendment,[22] and is also guaranteed by article I, section 11, of the Alaska Constitution.[23] The right to confrontation generally serves "to give a defendant charged with crime an opportunity to cross-examine the witnesses against him" [24] and "to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' " [25] Commentators have described the right "as beyond any doubt the greatest legal engine ever invented for the discovery of truth." [26]

■ In *Amidon v. State*, 565 P.2d 1248 (Alaska 1977), there is some indication that if a statement falls within the exception to the hearsay rule, a defendant's right to confrontation is automatically satisfied. Under the facts presented in *Amidon*,

where the out-of-court statement of the co-defendant was obviously false, there could not have been a violation of the right to confrontation, therefore it was unnecessary to explore the issue in depth. We believe that *Amidon* should be clarified, however, and hold today that evidence admissible under the joint undertaking exception to the hearsay rule does not automatically satisfy the requirements of the confrontation clause. To satisfy the right to confrontation, a statement must have sufficient indicia of reliability. We adopt the test articulated by the Ninth Circuit in *United States v. Snow*, 521 F.2d 730, 734–36 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). Under the *Snow* test, the statements must bear an indicia of reliability such that

> the unavailability of the declarant for cross-examination [did not deprive] the jury of a satisfactory basis for evaluating the truth of the extrajudicial declarations.

*Id.* at 734. The *Snow* court, relying upon *Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213, 227 (1970) (plurality opinion),[27] set forth a number of factors which are indicative of reliability:

**21.** U.S.Const., amend. VI, provides in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

**22.** *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923, 926 (1965).

**23.** Alaska Const., art. I, § 11, provides in pertinent part, "The accused is entitled . . . to be confronted with the witnesses against him . . . ."

**24.** *Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965). *See Evans v. State*, 550 P.2d 830, 836 (Alaska 1976).

**25.** *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970) (plurality opinion). *See Evans v. State*, 550 P.2d 830, 836 (Alaska 1976).

**26.** *Evans v. State*, 550 P.2d 830, 836 (Alaska 1976), *quoting* 5 J. Wigmore, Evidence § 1367 at 32 (Chadbourn rev. 1974).

**27.** The United States Courts of Appeals have split on the question of whether admissibility

under the co-conspirator hearsay exception is equivalent to satisfaction of the confrontation clause. In the following cases, circuit courts held that the hearsay exception does not guarantee constitutionality: *United States v. Weaver*, 565 F.2d 129, 135 n. 7 (8th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978); *McLaughlin v. Vinzant*, 522 F.2d 448, 450 (1st Cir. 1975), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975); *United States v. Snow*, 521 F.2d 730, 734–36 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Puco*, 476 F.2d 1099, 1102–04 (2d Cir. 1973), *cert. denied*, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). In the following cases, circuit courts held that the hearsay exception guaranteed constitutionality: *United States v. McManus*, 560 F.2d 747, 750 (6th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978); *United States v. Papia*, 560 F.2d 827, 836 n. 3 (7th Cir. 1977); *Ottomano v. United States*, 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973), *rhg. denied*, 410 U.S. 948, 93 S.Ct. 1383, 35 L.Ed.2d 616 (1973); *United States v. Cox*, 449 F.2d 679, 688–89 (10th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

(1) the declaration contained no assertion of a past fact, . . . (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.[28]

*Snow*, 521 F.2d at 734 (footnote added).

 All four factors are applicable to this case. The two statements made by Laschober which the appellants contend violated their right to confrontation were: (1) Hawley's drugs were fronted to him, and (2) "Tim" was her source. Regarding the first factor, both these statements contained no express assertion of a past fact. Regarding the second factor, Laschober's personal knowledge of the identity and role of Poirier and Hawley is established by her actions in concert with them. Although she may not have known his identity, she knew Hawley's role and his necessity to the plan. Regarding the third factor, the possibility that Laschober was relying upon a faulty recollection was extremely remote since the statements concerned the sellers in the present transaction. Regarding the fourth factor, Laschober believed that the officers were potential customers, and she would have had little motivation to lie to them.[29] In short, we conclude that the statements were sufficiently reliable to satisfy the requirements of the confrontation clause.

## B. Severance for Exculpatory Evidence

Wall argues alternatively that the trial court abused its discretion in failing to grant a severance because co-defendant Laschober possessed exculpatory information concerning Wall which could not be divulged if they were tried jointly. Laschober's counsel had previously indicated that Laschober would not take the stand if there was a joint trial. Subsequently, Wall submitted an affidavit by Laschober stating that if she were called in a court proceeding in which she was not a defendant she would be willing to testify under oath that: (1) before her arrest, she had never seen Robert Wall nor had any contact with him; and (2) she had no idea Wall was associated with her arrest in any alleged cocaine trans-

---

In *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489, 495–96 (1970), the court stated:

> Our decisions have never established [between the hearsay rule exceptions and the confrontation clause] such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. [Citations and footnote omitted.]

*See generally* Davenport, *The Confrontation Clause and the Co-conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1385 (1972); Advisory Comm. Introd. Alaska R.Evid. Art. VIII, Introductory Reporters Comment, at 215–16.

**28.** We have omitted the following language: "and consequently carried a warning to the jury against giving it undue weight." The phrase had some application in the factual context of *Dutton*, where a cellmate of an alleged accomplice said that if it had not been for Evans, "we wouldn't be in this now." The court apparently was emphasizing that admission of the testimony did not have a significant effect on the jury, as might have been the case had the accomplice discussed the crime itself. It seems to us, however, that the inference of the statement was as to a past fact, *i. e.*, Evans' participation in the murder. We also believe that references to past facts are less reliable than ongoing statements as to activities at the time of participation in the undertaking. It is in that sense that we include this factor.

**29.** The statement by Laschober that her source had his drugs fronted to him was of doubtful prejudice to Wall. It was obvious that Hawley was getting his drugs from somewhere. Moreover, the statement did not identify the source. Also, Laschober's identifying her source as "Tim" was of marginal relevance in that Hawley's identity as the participator in the endeavor was previously ascertained by the police who observed him conversing with Laschober at the drugstore and followed him home.

action. Wall also moved for an *in camera* hearing to disclose more particularly the exculpatory material Laschober possessed as well as her willingness to testify at a later proceeding. Both motions were denied.

■■■ "Relief from prejudicial joinder is discretionary with the trial judge in Alaska."[30] Criminal Rule 14 provides in pertinent part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

Under the circumstances of this case, we do not think the trial court abused its discretion. Assuming that Laschober would have been willing to testify at a separate trial, her testimony as indicated by her affidavit would have been of minimal, if any, significance. The prosecution, at trial, never attempted to show that Laschober met with Wall or knew that he was associated with the cocaine transaction. Furthermore, it is common knowledge that the seller in drug transactions is often ignorant of the identity of the source of his or her supplier.

Given the marginal relevance of the proposed testimony, we hold that the trial court did not abuse its discretion in denying the motion for severance.

## PEREMPTORY DISQUALIFICATION

Both appellants[31] claim that the trial court erred in ruling that all three defendants were allowed only one peremptory disqualification of a judge under AS 22.20.-022[32] and Criminal Rule 25.[33] We believe that each side is entitled to only one peremptory challenge. Therefore, the trial court did not err.

In *Peterson v. State*, 562 P.2d 1350 (Alaska 1977), the appellant argued that AS 22.-20.022 provides a party and his attorney each with a peremptory challenge and, to the extent that Criminal Rule 25(d) attempts to limit that substantive right to one challenge between the two of them, it is invalid. We rejected this argument, concluding that under Criminal Rule 25 and AS 22.20.022, the defense and the state are each entitled to only one peremptory challenge.

■■■ Similarly we believe that where there are several defendants in a criminal trial, each individual defendant is not entitled to one peremptory challenge, but rather the defense as a whole is entitled, as a

---

**30.** *Middleton v. State*, 577 P.2d 1050, 1052 (Alaska 1978). *See also United States v. Echeles*, 352 F.2d 892, 896 (7th Cir. 1965).

**31.** Hawley did not object to the trial court's ruling and, therefore, we do not consider his arguments on this point.

**32.** AS 22.20.022 provides, in part:

> *Peremptory disqualification of a superior court judge.* (a) If a party or his attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.
>
> · · · · ·
>
> (d) No party or his attorney may file more than one affidavit under this section in an action and no more than two affidavits in an action.

**33.** Rule 25(d)(1), Alaska R.Crim.P., states:

> *Entitlement.* In any criminal case in superior or district court, the prosecution and the defense shall each be entitled as a matter of right to one change of judge. When multiple defendants are unable to agree upon the judge to hear the case, the trial judge may, in the interest of justice, give them more than one change as a matter of right; the prosecutor shall be entitled to the same number of changes as all the defendants combined.

matter of right, to but one peremptory challenge.[34] Our rule does provide that where the defendants cannot agree on the judge to hear the case the trial court, in the interest of justice, can give more than one change. Here no showing of divergent interests or other cause was made requiring the judge, in the interests of justice, to grant additional challenges. There is no constitutional right to a peremptory challenge. To allow each defendant a peremptory challenge would cause great delays and trial scheduling problems. We conclude that when, as here, the defendants have substantially similar interests, it is not an abuse of discretion to limit the defense to one peremptory challenge.[35] Any other challenges must be for cause. Here there were no challenges for cause. We hold that the trial court did not err in denying the motion for an additional peremptory challenge.

## SUPPRESSION OF THE UNMARKED MONEY

At the time of Hawley's arrest he was found in possession of $1,157.00 in unmarked currency. At a hearing on a motion to suppress this evidence, the prosecution argued that its introduction would be justified because it had probative value tending to show that the defendant was probably engaged in illegal transactions requiring large amounts of cash. The court agreed that the currency's probative value outweighed its prejudicial effect and ruled it would be admissible. Hawley contends that the trial court erred in admitting this evidence because the evidence is irrelevant. We disagree.

The admissibility of evidence is largely within the trial court's discretion and its rulings will not be overturned on appeal in the absence of an abuse of discretion. *See Poulin v. Zartman*, 542 P.2d 251, 260 (Alaska 1975). In *Poulin*, we enunciated the test for relevance:

Alaska case law defines the test of relevancy. "To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case." *Hutchings v. State*, 518 P.2d 767, 769 (Alaska 1974). The dual concepts of logical relevance, *i. e.*, some tendency to establish the ultimate point for which the evidence is offered, and materiality, *i. e.*, germaneness of the ultimate point to issues in the trial, have been emphasized repeatedly in our opinions.

542 P.2d at 260 (footnote omitted).[36] The proffered evidence has some tendency, when connected with the other evidence presented in this case, to establish the Hawley was engaged in drug trafficking. It is more likely than not that a person engaged in such activity would need a large amount of currency. Consequently, we cannot say that the trial court abused its discretion in admitting the evidence.

## SENTENCE APPEAL

The trial court sentenced appellant Hawley to concurrent sentences of six years for the sale of one ounce of cocaine, and two and one-half years for the attempted sale of an additional five ounces. Appellant Wall was sentenced to seven years for the sale of

---

34. Here the motion for the peremptory challenge was granted without consulting the other defendants or their counsel. We believe that the following procedure should be observed in multiple defendant cases. The trial court should inquire if this is a joint decision or, at least, require that the defendants confer before rendering its decision. It is not necessary, however, for all defendants to agree to the peremptory challenge.

35. Although Wall's counsel asserted that his client's interests were substantially different

from the other defendants, he failed to explain what these differences were.

36. Since this trial, Alaska Rules of Evidence have become effective. Rule 401 provides:

*Definition of Relevant Evidence.* Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

one ounce. Both appeal their sentences as excessive.

■ We shall first consider Hawley's sentence appeal. At the time of sentencing, Hawley was twenty-two years old. He had a previous felony conviction for receiving and concealing stolen property. For that conviction, he received a two-year suspended imposition of sentence. During the probationary period, he was jailed for violating his probation. Almost immediately after his release, he was arrested for the present offense. Hawley was uncooperative with the probation officer preparing the report for the present conviction. Additionally, at the time of his arrest, papers were found in Hawley's jacket which contained notations indicating that Hawley had made drug sales to approximately twenty other individuals. We have independently reviewed the record and believe that the trial court gave adequate consideration to all of the sentence criteria listed in State v. Chaney, 477 P.2d 441, 443–44 (Alaska 1970). Under these circumstances, we cannot say that the trial court was clearly mistaken in imposing Hawley's sentence.

Waters v. State, 483 P.2d 199, 201 (Alaska 1971), supports this conclusion. In Waters, we classified drug offenses in descending order of seriousness. We stated that sale of large quantities of narcotics or possession of large quantities for sale was the most serious. The record indicates that Hawley fits within this classification. His record is similar to Waters' record.[37] Although we had some reservations, we affirmed Waters' ten-year sentence for unlawful sale of cocaine and a concurrent five-year sentence for robbery. Waters demonstrates that

Hawley's concurrent sentences of six years for sale of one ounce of cocaine and two and one-half years for attempted sale of an additional five ounces is not excessive.[38]

■ We next consider Wall's sentence appeal. At the time of sentencing, he was twenty-six years old. Since 1977 he has held only odd jobs. He had a substantial record of prior convictions, including false evidence of age, burglary, transfer of marijuana, possession of restricted dangerous drugs, and possession of burglary tools. At the time of his arrest, there was an outstanding warrant in California for Wall because he had violated his probation. The present offense, sale of one ounce of cocaine, is a serious one for which he showed no remorse. Moreover, the facts of this case suggest that Wall was a sophisticated seller. Our review of the record shows that the trial court gave adequate consideration to all of the Chaney criteria including Wall's rehabilitation potential. Wall, like Hawley, fits within the most serious Waters category. Under these circumstances, we do not believe that the trial court was clearly mistaken in imposing a sentence of seven years.

The judgment is AFFIRMED.

---

37. Waters, like Hawley, was twenty-two years old at the time of sentencing. He had a prior felony conviction for larceny. While on probation, he committed the offense of unlawful sale of cocaine and robbery.

38. See also Johnson v. State, 577 P.2d 230 (Alaska 1978) (concurrent sentences of six years for two counts of sale of cocaine where defendant had a prior felony offense and his probation had been previously revoked was not

excessive). Cf. Gonzales v. State, 608 P.2d 23 (Alaska 1980) (three concurrent terms of ten years with five suspended on three counts of selling cocaine and three concurrent terms of five years with all five suspended on probation on three counts of selling cocaine affirmed except as modified to have the sentence on the latter three counts run consecutively with the period of probation on the first three counts).