**Darryl G. STEWART, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–1117.

Court of Appeals of Alaska.

May 13, 1988.

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Darryl G. Stewart was convicted of one count of misconduct involving a controlled substance in the second degree (delivery of heroin). AS 11.71.020(a). Following a bench trial before Superior Court Judge Karl S. Johnstone, Stewart was sentenced to eight years' imprisonment with three years suspended. Stewart appeals his conviction and sentence. We affirm his conviction, but remand for resentencing.

## FACTS

The charge against Stewart arose out of the sale of twenty-two grams of heroin by Curtis Young to Police Investigator Eduardo Campoamor on December 5, 1984. Stewart's charge was part of a multicount indictment involving other drug-related offenses by Curtis Young, James Wheeler, Ernestine Walker, and Larry Washington. Campoamor bought small quantities of heroin from Young and Wheeler on several occasions. In the course of these transactions, Campoamor and Wheeler spoke about a man in Seattle known as "Buck" in terms suggesting that Buck was the supplier of Wheeler's heroin. Buck was later identified as Larry Washington.

On December 3, 1984, Campoamor attempted to purchase an ounce of heroin from Wheeler. Wheeler said he would have to phone "his people." Campoamor called Wheeler later that evening. The person who answered the phone said that Wheeler was not there, but offered to let Campoamor speak with "Curtis." Curtis Young told Campoamor that he and Wheeler were "partners ... in the same family." Young said he had been checking on the price for an ounce, but had not been able to contact "his boy."

On December 5, Campoamor had another series of conversations with Young about buying an ounce of heroin. In the afternoon, Young told Campoamor that the heroin "was supposed to be arriving." At 9:23 p.m., Young called Campoamor and left a coded message that the heroin had arrived. When Campoamor returned Young's call, Young told him that he had to pick up the drug at the airport.

At the airport, several police officers were conducting surveillance on incoming flights from Seattle. At 9:40 p.m., the officers noticed a man, later identified as Stewart, that they regarded as suspicious. Approximately twenty minutes later, the officers observed Young meeting Stewart. Young and Stewart left together, and they arrived at Young's residence at about 10:26 p.m. At 10:29 p.m., Young telephoned Campoamor, repeating the coded message that the heroin was in. Young stated that

he needed to "break down the material." Young arranged to meet Campoamor at the Kentucky Fried Chicken on Muldoon at 11:00 p.m. Young and Stewart left Young's Turpin Street apartment at 11:05 p.m., and drove in Young's car to Muldoon. Young parked in the parking lot of the Sportsman's Too bar. Young went to a phone booth and left a message for Campoamor to call him at the phone booth number.

While Campoamor was looking for a phone booth, he saw Young's car, and also saw Young standing in the phone booth. Campoamor pulled up next to Young, and Young got into Campoamor's vehicle. Campoamor and Young drove across the street to complete the transaction, while Stewart remained in Young's car.

After Campoamor and Young drove off, Stewart left Young's car and walked around the parking lot. Stewart walked back and forth in front of the Sportsman's Too, looking around the corners of the building and down the alley. He spoke briefly with a woman who came out of the bar.

After completing the transaction, Campoamor dropped Young off in the Sportsman's Too parking lot. As Young approached his car, Stewart began walking towards Young. Before Young and Stewart could make contact, the police moved in and arrested them. Later, during a police search of Young's residence, one of Stewart's suitcases was found with a name tag reading "Bill Jones" on it.

## CO–CONSPIRATOR STATEMENTS

Stewart argues that the trial court erred in admitting statements of Young and Wheeler against him as evidence. The trial judge admitted them as statements by a co-conspirator of a party made during the course of and in furtherance of a conspiracy. A.R.E. 801(d)(2)(E).

In order to admit co-conspirator statements against a defendant, the prosecution must show:

1) the existence of a conspiracy; ...

2) that the statement was made while the conspiracy was continuing; and

3) that the statement was made "in furtherance" of the conspiracy.

*Adams v. State*, 706 P.2d 1183, 1187 n. 3 (Alaska App.1985). The existence of the joint undertaking must be shown by a preponderance of the evidence. *Hawley v. State*, 614 P.2d 1349, 1354–56 & n. 9 (Alaska 1980). Stewart does not contest that there was a conspiracy to distribute heroin or that the various statements which were admitted against him were made while the conspiracy was continuing and were made in furtherance of the conspiracy. Rather, Stewart argues that before any statements of co-conspirators could be admitted against him, the state was required to show, by a preponderance of the evidence, that Stewart was part of the conspiracy. The state argues that they did present sufficient proof to show that Stewart was a part of the conspiracy to distribute heroin.

Stewart argues that the state was required to show his connection with the conspiracy by evidence which was independent of the co-conspirator statements. This was clearly the law in Alaska at the time of *Hawley. See* 614 P.2d at 1354–56. Subsequent to *Hawley*, however, the United States Supreme Court decided *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In *Bourjaily*, the majority of the court held that the trial judge could consider the co-conspirator's statements in deciding whether there was sufficient evidence to show that there was a conspiracy. *Id.* 107 S.Ct. at 2782. The Supreme Court relied on Federal Rule of Evidence 104(a), which provides in part: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges." Alaska Rule of Evidence 104(a) is identical to Federal Rule of Evidence 104(a). Inasmuch as it appears that *Hawley* relied on former federal authority, which required proof of the conspiracy by independent evidence, it is possible that the Alaska Supreme Court would follow *Bour-*

*jaily*. There was a strong dissent in *Bourjaily*, however, so it is also possible that the Alaska Supreme Court would adhere, on state grounds, to the independent evidence of the conspiracy test it previously set forth in *Hawley*.

■ The state argues that, even under the *Hawley* test, there was sufficient evidence of the conspiracy and Stewart's connection to the conspiracy to uphold Judge Johnstone's decision to admit the co-conspirator statements. The state points to Young's statement made to Campoamor indicating that he had to pick up the drug at the airport, and also points to *United States v. DeJesus*, 806 F.2d 31 (2nd Cir. 1986), *cert. denied*, — U.S. —, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). According to the state, *DeJesus*, which was decided before *Bourjaily*, stands for the proposition that, in determining whether there was independent evidence of a conspiracy, the court may use statements of co-conspirators that are independently admissible under an exception to the hearsay rule. The *DeJesus* court stated:

> The requirement that independent proof of membership in a conspiracy be provided before a co-conspirator's hearsay statements are admitted is designed to avoid the bootstrapping use of such statements to form the foundation for their own admission. No such bootstrapping is involved, however, where a co-conspirator's hearsay statement is admissible against a defendant under an exception to the hearsay rule other than the co-conspirator exception.

806 F.2d at 35. In *DeJesus*, the court specifically allowed evidence of a declarant's statement of what he planned to do in order to prove his future actions. *See* A.R.E. 803(3) (frequently called the "state of mind" exception).[1] Similarly, in this case, Young's statement that he was going to pick up the drug at the airport is admissible under A.R.E. 803(3) to show Young's purpose in going to the airport, namely, to get the heroin.[2]

■ Stewart argues that even if Young's statement is admissible to show that he was going to the airport to pick up the heroin, Young's statement cannot be used to show that Stewart brought in the heroin. *See* E. Cleary, *McCormick on Evidence* § 295, at 699 (2d. ed. 1972); Commentary to A.R.E. 803(3). We believe that this point might be valid if the only evidence that Stewart brought the heroin into the airport was limited to Young's statement to that effect. For purposes of establishing the conspiracy, however, Young's statement needs to be admitted only for the purpose of showing that, at the time he called Campoamor, Young's purpose in going to the airport was to get heroin. The statement was not necessary to prove that Stewart was at the airport. The fact that Young met Stewart at the airport a short time later was independently proven by the observations of the officers at the airport. *See DeJesus*, 806 F.2d at 35.

■ The evidence of Stewart's connection to the conspiracy includes (1) Young going to the airport for the purpose of getting the heroin; (2) Stewart being observed at the airport at 9:40 p.m. by the officers who were watching for people coming in on flights from Seattle; (3) Young meeting Stewart at the airport at about 10:00 p.m.; (4) Young and Stewart leaving

---

**1.** Alaska Rule of Evidence 803(3) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove his present condition or future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Federal Rule of Evidence 803(3) is identical to A.R.E. 803(3).

**2.** Judge Johnstone did not rely on this statement to determine whether there was sufficient evidence to show a conspiracy. On appeal, however, we are not limited to the evidence which the trial court stated it relied upon to determine whether there was sufficient independent evidence of a conspiracy. *DeJesus*, 806 F.2d at 34 n. 4.

the airport together and going to Young's residence, arriving at approximately 10:26 p.m.; (5) Young and Stewart leaving Young's apartment together at 11:05 p.m.; and (6) Stewart's presence across the street in Young's car while Young made the sale to Campoamor. It appears to us that the state has shown Stewart's connection to the conspiracy by a preponderance of the evidence. It is possible, on these facts, that Stewart was an innocent bystander. It is much more likely, however, that Stewart brought the heroin in from Seattle, that he went to Young's apartment so that the drug could be broken down and the sale to Campoamor could be set up, and that he accompanied Young to keep his eye on the heroin or to act as a lookout, or both. Inasmuch as Stewart's connection to the conspiracy was established, the trial judge did not err in admitting Young's statements as co-conspirator statements. Young's statements were the critical statements in establishing Stewart's guilt. It does not appear that Wheeler's statements added anything to the case against Stewart other than background information. Accordingly, we do not find that the trial judge erred in admitting the statements of Young and Wheeler.

### SENTENCE

■ Stewart next argues that his sentence, eight years' imprisonment with three years suspended, was excessive. Stewart was convicted of misconduct involving a controlled substance in the second degree, a class A felony. AS 11.71.020(a). At the time of this offense, Stewart was a twenty-five-year-old first felony offender with only two minor misdemeanor convictions on his record. A first felony offender convicted of a class A felony is subject to a presumptive sentence of five years. AS 12.55.-125(c)(1). In sentencing Stewart, Judge Johnstone found two aggravating factors: (1) Stewart was a member of an organized group of five or more persons, and the offense was committed to further the criminal objectives of the group; and (2) the offense involved the transportation of drugs into the state. AS 12.55.155(c)(14)

and (24). Judge Johnstone rejected Stewart's three proposed mitigating factors: (1) Stewart played only a minor role in the commission of the offense; (2) the conduct constituting the offense was among the least serious conduct included in the definition of the offense; and (3) the harm caused by Stewart's offense was consistently minor and inconsistent with the imposition of a substantial period of imprisonment. AS 12.55.155(d)(2), (9), and (13). Judge Johnstone also rejected Stewart's argument that the case should be referred to the three-judge panel. AS 12.55.165.

Stewart argues that Judge Johnstone erred in rejecting his proposed mitigating factors. We disagree. Judge Johnstone found that Stewart had brought into the state twenty-two grams of heroin (about three-quarters of an ounce) into the state, and that he had participated in breaking the heroin down and selling it. Under these circumstances, Judge Johnstone could conclude that Stewart did not establish these mitigating factors by clear and convincing evidence.

■ Stewart also argues that Judge Johnstone erred in concluding that the state established that Stewart "was a member of an organized group of five or more persons, and the offense was committed to further the criminal objectives of the group." AS 12.55.155(c)(14). Stewart contends that in order to find this aggravating factor, the state must establish that Stewart knew that the conspiracy involved five or more members. He claims that there was no showing that Stewart knew of the existence of any conspirators other than Young. The state concedes that it has to show that the defendant had some knowledge of the scope of the conspiracy. It contends, however, that it must show only that the defendant was "reckless" as to the size of the conspiracy.

To establish aggravating factor AS 12.-55.155(c)(14), the state must show the defendant had some knowledge as to the size and scope of the conspiracy. Stewart would not have to specifically know the identity of four other individual members, but he would have to be aware of the size

and scope of the conspiracy. This idea seems to be included in the concept of membership. Before Stewart could be subject to the aggravating factor, he would have to be aware of his membership in the conspiracy.

The evidence which the state has pointed to in support of the aggravating factor shows a solid connection only to Young, though it can also be reasonably inferred that Stewart received the heroin from someone in Seattle. Stewart's connection to the other conspirators in Anchorage, however, appears tenuous. Evidence was presented that Stewart was acquainted with Washington, Young, and Wheeler. There was also evidence that Ernestine Walker was aware that the heroin was supposed to be arriving. The state does not argue, however, that Stewart was acquainted with Walker, or that he was even aware of her existence. Although it is a close question, given our conclusion that the state had to show Stewart's awareness that the conspiracy consisted of five or more members, we conclude that the state did not prove, by clear and convincing evidence, Stewart's membership in a conspiracy of five or more people. Accordingly, we remand for reconsideration of Stewart's sentence.

Although Judge Johnstone may choose to reduce Stewart's sentence in light of our conclusion that the state did not prove one of the aggravating factors, we believe that we can still review Stewart's contention that his sentence was excessive. Judge Johnstone imposed the presumptive five-year sentence and, in addition, added three years suspended based on the two aggravating factors which he found. Essentially, Stewart argues that Judge Johnstone erred in imposing the presumptive sentence.

In *McReynolds v. State*, 739 P.2d 175 (Alaska App.1987), we concluded that any sentence in excess of five years with two and one-half years suspended would be excessive for that particular sale of heroin. In that case, however, the trial judge found two distinct mitigating factors: (1) the sale involved a small amount of heroin (one-quarter gram for $100); and (2) the conduct constituting the offense was among the least serious conduct within the definition of the offense. *Id.* at 179–80. McReynolds sold a small quantity of heroin to a friend in what appeared to be a noncommercial, isolated transaction. Stewart, however, was convicted of delivering twenty-two grams of heroin, about three-quarters of an ounce. This was a substantial commercial transaction which involved Stewart bringing the drug into the state from Seattle.

We conclude that there was sufficient evidence of Stewart's substantial participation in this offense to justify imposition of the presumptive sentence. It follows that the trial judge did not err in failing to refer this case to the three-judge panel. We also conclude that, based upon the aggravating factor which Judge Johnstone found, that Stewart's offense involved the transportation of a controlled substance into the state, Judge Johnstone could impose three suspended years in addition to the presumptive sentence.[3] We conclude the sentence is not clearly mistaken.

The conviction is AFFIRMED. This case is REMANDED for resentencing consistent with this opinion.[4]

BRYNER, C.J., dissents.

BRYNER, Chief Judge, dissenting.

I agree with the majority opinion except to the extent that it reads a requirement of

3. Stewart has not contested the applicability of this aggravating factor. Considering the facts which gave rise to Stewart's conviction for misconduct involving a controlled substance in the second degree, the only reasonable assumption is that he transported the drug into Alaska.

4. On remand, Judge Johnstone must re-evaluate his sentence based upon our conclusion that the state did not prove the aggravating factor, AS 12.55.155(c)(14). Judge Johnstone is not required to hold a new sentencing hearing or have further briefing from the parties on this issue. He obviously has the discretion, however, to allow briefing or hold hearings in re-evaluating Stewart's sentence.

knowledge into the aggravating factor specified in AS 12.55.155(c)(14). We are dealing here not with the statutory definition of a crime, but only with an aggravating factor—one limited component of the defendant's overall sentence. There can be no credible claim that a culpable mental state is constitutionally required. Nor is the requirement of actual knowledge implicit in the concept of membership. While membership in an organized group clearly presupposes knowledge of the existence of the group, it certainly does not imply an acquaintance with all of its members or an awareness of its size.

The absence of any specific provision for a culpable mental state in AS 12.55.155(c)(14) provides no basis for inferring a legislative intent to require actual knowledge. To the contrary, even a cursory review of the various statutory aggravating factors establishes that the legislature has expressly provided for culpable mental states when it wanted to do so. For example, in AS 12.55.155(c)(2), (16), and (23) the legislature created aggravating factors expressly requiring intentional or deliberate conduct; knowing conduct is explicitly required in AS 12.55.155(c)(9), (13), and (22); and AS 12.55.155(c)(5) provides for a mental state akin to negligence or recklessness ("the defendant knew or reasonably should have known"). The legislature's specific inclusion of culpable mental states in these provisions is strong evidence that its omission of a culpable mental state in AS 12.55.155(c)(14) was deliberate.

Neither logic nor concerns with fairness militate in favor of creating a culpable mental state for the challenged aggravating factor. Aggravating factors are intended to reflect generally on the seriousness of a defendant's conduct in a given case. See *Juneby v. State*, 641 P.2d 823, 833 (Alaska App.1982), *modified on other grounds*, 665 P.2d 30 (Alaska App.1983). Crimes that are planned and executed by large organized groups will often pose a more significant threat to society than similar crimes committed by individuals or small groups. It follows that the criminal conduct of an offender who acts as part of a large group can generally be regarded as more serious than similar conduct engaged in by a like offender as part of a smaller group. Under the circumstances, the offender's awareness of the size of the group does not alter the seriousness of the conduct. It hardly seems unfair to conclude that those who choose to engage in a criminal conspiracy proceed at their own risk insofar as the size of the conspiracy is concerned.

In the present case, Stewart's knowledge that he was a member of an organized group is established by the trial court's finding that he participated in a conspiracy —a finding that this court has expressly approved. The possibility that Stewart may not have been aware of the precise size of the conspiracy in which he elected to become involved could certainly be considered by the sentencing court in determining the weight to be given to the challenged aggravating factor. In fact, there is no indication that Judge Johnstone did not consider this possibility. I see utterly no basis for imposing on the state the additional burden of establishing Stewart's actual awareness of the size of the conspiracy. Accordingly, I would affirm the sentence imposed below.